KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Joseph C. Corneau
Christopher Reilly
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

Attorneys for the Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
: 
In re: : Chapter 11
 :
1141 REALTY OWNER LLC, et al., : Case No. 18-12341(SMB)
 :
                Debtors. : Jointly Administered
 :
------------------------------------------------------------------X

**DEBTOR'S REPLY IN FURTHER SUPPORT OF OBJECTION TO
CLAIM NO. 14 FILED BY WILMINGTON TRUST, N.A., SOLELY IN ITS
CAPACITY AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED
HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE TRUST
2015-C28, COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES,
SERIES 2015-C28, SOLELY WITH RESPECT TO THE ISSUE OF THE
ENFORCEABILITY OF THE "YIELD MAINTENANCE DEFAULT PREMIUM"**

      1141 Realty Owner LLC ("Debtor")[1], one of the debtors and debtors-in-possession in the

above captioned cases (the "Chapter 11 Cases"), hereby submits this reply in further support of

its objection (the "Objection")[2] to the claim of the Wilmington Trust, N.A., solely in its capacity

as Trustee for the benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust

---

[1] The Debtors herein and the last four digits of their respective tax identification number are: 1141 Realty Owner LLC (1804) and Flatironhotel Operations LLC (4773). The Debtors' principal place of business is 9 West 26th Street a/k/a 1141 Broadway, New York, New York.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Objection.

2015-C28, Commercial Mortgage Pass Through Certificates, Series 2015-C28 ("Claimant"), and respectfully states as follows:

## BACKGROUND

The Loan Agreement and Lender's Acceleration

1. The Debtor is party to a certain Loan Agreement ("Loan Agreement"), dated as of April 16, 2015, between the Debtor as borrower and Rialto Realty Finance, LLC, as lender ("Rialto") in the original principal amount of $22,500,000. Subsequent to the Loan Agreement, through a series of assignments Rialto assigned its rights in the Loan Agreement and related documents to Wilmington Trust, N.A., solely in its capacity as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-C28, Commercial Mortgage Pass-Through Certificates, Series 2015-C28, and RMezz Flatiron LLC together, the "Lender").

2. On September 15, 2017, the Lender sent a Notice of Default and Acceleration (the "Acceleration Notice") to Owner, notifying Owner that Lender "hereby accelerates and demands immediate repayment in full of the entire outstanding indebtedness due under the Note, the Mortgage, and the Loan Documents. . . ." See Claim, Exhibit H.

The Bankruptcy Case

3. On July 31, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to manage and operate its business as debtor-in-possession.

4. The United States Trustee has not appointed an official creditors' committee in the Chapter 11 Cases. No trustee or examiner has been appointed in the Chapter 11 Cases.

5. On November 2, 2018, Claimant filed its claim (the "Claim") against the Debtor

with the Clerk (the "Clerk") of the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Claim was designated as Claim No. 14 by Omni Consulting Inc., the Debtor's claim and noticing agent.

6. On November 16, 2018, the Debtor filed an objection to the Claim [Docket No. 84) on the bases that (i) the Lender had not provided sufficient documentation to prove the amount due to the Lender with respect to the Claim; and (ii) the Lender is not entitled to payment of the Yield Maintenance Default Premium as that term is defined in the Loan Agreement (the "Yield Maintenance Default Premium").

7. On December 13, 2018, the Lender filed its response to the Debtor's objection (the "Response") [Docket No. 94].

8. On January 11, 2019 the Court entered an order (Docket No. 100) which (i) provided that the Court would treat the Response as a motion for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 9014 solely with respect to issues relating to the Yield Maintenance Default Premium; and (ii) set a briefing schedule for determination of such summary judgment motion.

**THE YIELD MAINTENANCE DEFAULT PREMIUM SHOULD BE DISALLOWED**

9. As conceded by the Lender in the Response, "when a lender exercises its option to accelerate a loan, that acceleration date becomes the maturity date, and the entire debt becomes due. By accelerating the loan, the lender elects 'to give up [its] future income stream in favor of having an immediate right to collect [its] entire debt.' Accordingly, a borrower's repayment after acceleration is not considered voluntary and does not trigger the lender's right to prepayment consideration." *In re S. Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011) (quoting *In re Solutia Inc.*, 379 B.R. 473 (Bankr. S.D.N.Y. 2007)); *see also Momentive*

3

*Performance Materials Inc. v. BOKF, NA, et al.*, 874 F.3d 787 (2d Cir. 2016).

10. The two exceptions to this general rule are if (i) the parties expressly agree that the prepayment consideration remains due even after acceleration of the debt; or (ii) sufficient evidence is presented to show that the borrower intentionally defaulted on the loan in order to cause the acceleration of the debt in an effort to avoid payment of the prepayment consideration.

11. Based upon the terms of the Loan Agreement, the Yield Maintenance Default Premium portion of the Claim should be disallowed because: (a) the Loan Agreement does not *expressly* provide for the availability of the Yield Maintenance Default Premium after the *Lender* accelerated the debt; and (b) the Debtor did *not* intentionally cause the debt to be accelerated for the purpose of evading the payment of the Yield Maintenance Default Premium.

The Loan Agreement Does Not Specifically Provide for
"Yield Maintenance Default Premium" After the Lender's Voluntary Acceleration of the Debt

12. Courts will generally allow a prepayment premium after the lender's election to accelerate the debt only if "the loan agreement *expressly* requires it." *U.S. Bank. Nat'l Ass'n v. S. Side House, LLC*, 451 B.R. 248, 267 (Bankr. E.D.N.Y 2011) (emphasis supplied). In each of the cases in which courts have upheld the validity of a prepayment premium subsequent to acceleration of the debt, including those cited by the Lender in the Response, the loan agreement *expressly* provides that such premiums are due after acceleration by using some variant of the word "acceleration." *See In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 197 (Bankr. S.D.N.Y. 2012) (loan agreement provided that "[i]f the Loan *is accelerated* during the Lockout Period for any reason other than casualty or condemnation, Borrower shall pay, in addition to all other amounts outstanding under the Loan documents, a prepayment premium equal to five percent (5%) of the outstanding balance of the Loan.") (emphasis supplied); *In re 400 Walnut Associates, L.P.*, 461 B.R. 308 (Bankr. E.D. Pa. 2011), *rev'd on other grounds*, 473 B.R. 603

4

(E.D. Pa 2012) (note provided that "*upon Lender's exercise of any right of acceleration* under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, (A) all accrued interest and all other sums due Lender under this Note and the other Loan Documents, and (B) the prepayment premium calculated pursuant to Schedule A") (emphasis supplied); *SO/Bluestar, LLC v. Canarsie Hotel Corp.*, 2006 NY Slip Op 7864, 33 A.D.3d 986, 987 (2d. Dept. 2016) (finding that the "note contained an express provision providing for the payment of prepayment consideration in the event of *acceleration* upon *default,* and such a provision is enforceable") (emphasis supplied); *E. Sav. Bank v. Munson*, 50 Conn. Supp. 374, 932 A.2d 1079, 1084 (Conn. Super. Ct. 2007) (stating that where the parties' agreement "expressly provides for imposition of a prepayment premium *upon acceleration*, that premium is required to be *included in the final* foreclosure judgment") (emphasis supplied); *Westmark Commercial Mortg. Fund IV v. Teenform Assocs., Ltd. P'ship*, 362 N.J. Super. 336, 343, 827 A.2d 1154, 1158 (Super. C*t. App. Div. 2003*) (loan agreement provided that "borrower specifically acknowledges and agrees that it shall be *liable for the prepayment premium on any acceleration of this note in* accordance with its terms at any time.) (emphasis supplied); *Matter of Schaumburg Hotel Owner Ltd. Partnership,* 97 BR 943, 953 (Bankr. N.D. Ill. 1989) (loan agreement provided that the borrower "agrees that the prepayment premium mentioned hereinabove shall be due and payable whether said payment is *voluntary or the result of prepayment created by the exercise of any acceleration clause after a default* provided for hereunder or under the Mortgage or Security Documents") (emphasis supplied).

13.    In fact, in the only case cited by Lender in which some form of the word acceleration is not specifically contained in the applicable provision*, In re AE Hotel Venture,* 321 B.R. 209, 218 (Bankr. N.D. Ill. 2005), the Court determined that the language of the loan

5

documents made the acceleration of the debt irrelevant because the prepayment premium was ***only*** due and owing if the entire debt was repaid "at any time prior to a sale of the Mortgaged Property . . ., either through foreclosure or the exercise of the other remedies available to [the lender] under the Mortgage." *Id.* at 218. The court stated that the relevant provisions "describe a sale resulting from [the lender's] use of its remedies under the [m]ortgage," and that any prepayment prior to such a sale would trigger the prepayment premium. *Id.* at 219. In the relevant provision in *AE Hotel*, it is clear that, for example, at any time during the foreclosure proceedings prior to a sale (which would be after acceleration of the debt) the borrower could have paid the debt in full and had agreed to pay the prepayment premium in such a scenario. Thus, the provision itself anticipated the payment of the premium subsequent to the acceleration of the debt.

14. Here, the parties ***did not*** specifically agree that the Yield Maintenance Default Premium would be due after the Lender's voluntary election to accelerate the debt. Section 2.3.3 of the Loan Agreement states:

> 2.3.3 Prepayments After Default. If, following an Event of Default which occurs prior to Free Window Date, payment of all or any part of the Debt is tendered by Borrower or otherwise recovered by Lender, such tender or recovery shall be deemed a voluntary repayment by Borrower in violation of the prohibition against prepayment set forth in Section 2.3.1 and Borrower shall pay, in addition to the Debt, (i) an amount equal to the Yield Maintenance Default Premium, (ii) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (iii) all other sums due and payable under this Agreement, the Note and other Loan Documents. Lender shall notify Borrower of the amount and the basis of determination of the required prepayment consideration.

6

15. The term "Event of Default" is defined in Section 7.1 of the Loan Agreement through a laundry list of potential defaults, and Section 7.2 states that upon an Event of Default the Lender retains all of its remedies in law and equity, to be exercised at its sole discretion, including "declaring the Debt to be immediately due and payable. . . ." *See* Loan Agreement, Section 7.2.

16. Although the parties agreed that "following an Event of Default" and "payment of all or any part of the Debt" the Yield Maintenance Default Premium would be due, the word "acceleration" is conspicuously absent from Section 2.3.3. Importantly, as the Response clearly points out, acceleration of the debt is an elective remedy of the Lender after an Event of Default, rather than automatic one, which remedy the Lender exercised through the Acceleration Notice.[3]

17. As stated by the Second Circuit in *Momentive Performance Materials Inc. v. BOKF, NA, et al.*, 874 F.3d 787 (2d Cir. 2016), the Lender's voluntarily acceleration "changed the date of maturity from some point in the future…to an earlier date based on the debtor's default under the contract…." *Id.* at 802 (quoting *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013)). By voluntarily accelerating the debt due under the Loan Agreement, the Lender exercised its option to declare the debt due and payable as of the Acceleration Notice, and therefore forfeited its right to receive the Yield Maintenance Default Premium.

18. Moreover, by the Loan Agreement's own terms, the Yield Maintenance Default Premium becomes due ***only*** if two separate conditions precedent are satisfied. First, there must be have been an Event of Default under the Loan Agreement and second, following that Event of

---

[3] Interestingly, the Acceleration Notice made a demand for "immediate repayment in full of the entire outstanding indebtedness due under the Note, the Mortgage, and the Loan Documents in the principal sum of $24,209,357.00 together with all accrued interest thereon (which interest continues to accrue at the default rate as set forth in the Loan Documents), and all other sums due under the Loan Documents," *see* Acceleration Notice, pg. 2, but does demand payment of the Yield Maintenance Default Premium which the Lender now essentially contends automatically became due and owing upon acceleration.

Default, "payment of all or any part of the Debt [must be] tendered by Borrower or otherwise recovered by Lender." *See* Loan Agreement, Section 2.3.3. The Lender sent the Debtor the Acceleration Notice (for non-monetary breaches of the Loan Agreement), thus both declaring an Event of Default and ***simultaneously*** accelerating the debt. Accordingly, there was no (and could not have been) "payment of all or any part of the Debt" between the Event of Default and the acceleration which would have triggered the Yield Maintenance Default Premium, and the Yield Maintenance Default Premium therefore was not due and payable at the time of acceleration.[4]

Lender has Not Provided Any Evidence that the Debtor
<u>Intentionally Defaulted to Avoid Payment of the Yield Maintenance Default Premium</u>

19.    Although the Lender claims that "[c]ourts have also not permitted borrowers to circumvent yield maintenance premiums when the borrower's voluntary actions cause the defaults," *see* Response, ¶29, in those cases there was proof submitted to show that the borrower entered into some sort of sale, spinoff, or liquidation transaction that frustrated the lender's collection and enforcement efforts, thus breaching the agreement and causing the acceleration. *See Wilmington Sav. Fund Soc'y v. Cash Am. Int'l, Inc.*, No. 15-CV-5027 (JMF), 2016 U.S. Dist. LEXIS 127421, at *29 (S.D.N.Y. Sep. 19, 2016) (enforcing a make-whole premium where "the transaction disposed of significant property (and for no consideration), reduced [the borrower's] future expected income, and materially changed its financial condition"); *see also Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir. 1982) (awarding

---

[4] To the extent that the Court determines that, pursuant to the terms of the Loan Agreement, the Yield Maintenance Default Premium became due prior to the Acceleration Notice because the Debtor made its regular loan payments after an Event of Default, the Yield Maintenance Default Premium must be considered an unenforceable penalty because the proposed damages here are plainly disproportionate to the Lender's loss absent a prepayment of the debt in full. *See In re S. Side House, LLC*, 451 B.R. 248, 270 (Bankr. E.D.N.Y. 2011) ("a prepayment premium is enforceable 'where (1) actual damages may be difficult to determine and (2) the sum stipulated is not 'plainly disproportionate' to the possible loss.'") (quoting *In re United Merchs. & Mfrs.*, Inc., 674 F.2d 134, 142 (2d Cir. 1982).

8

redemption premium when the default "stemmed from the plan of voluntary liquidation approved on March 26, 1979, followed by the unsuccessful attempt to invoke the successor obligor clauses."). Here, the Lender called a non-monetary default and elected to accelerate the debt and commence a foreclosure, rather than the Debtor actively taking steps to breach the agreement for its own benefit. In fact, if the Lender had not sent the Acceleration Notice and pursued the foreclosure, the Debtor may have continued to be timely with all of its payments to Lender.

20. Moreover, removing the "intent" requirement from the avoidance of prepayment premiums would be illogical and would essentially ignore *all* case law on this subject. If, as the Lender suggests, the intent of the borrower is irrelevant in the analysis of the avoidance of a prepayment premium, then borrowers would *always* be required to pay prepayment premiums after acceleration because a borrower would always be in a better position if the premium was not due. That is clearly not the law in New York or the Second Circuit, as in a multitude of cases cited herein the court limited or refused to enforce prepayment premiums after a lender's acceleration of the debt. *See, e.g.*, *Momentive Performance Materials Inc. v. BOKF, NA, et al.*, 874 F.3d 787 (2d Cir. 2016); *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013); *Nw. Mut. Life Ins. Co.*, 816 N.Y.S.2d 831 (Sup. Ct. 2006).

[remainder of page intentionally blank]

WHEREFORE, Debtor respectfully requests that this Court (a) enter an order determining that the Yield Maintenance Default Premium is not due and owing to the Lender, and (b) grant Debtor such other relief as the Court deems just and proper.

Dated: New York, New York
January 22, 2019

        KLESTADT WINTERS JURELLER
        SOUTHARD & STEVENS, LLP

By: *Tracy L. Klestadt*
    Tracy L. Klestadt
    Joseph C. Corneau
    Christopher Reilly
    200 West 41st Street, 17th Floor
    New York, New York 10036
    Tel: (212) 972-3000
    Fax: (212) 972-2245
    Email: tklestadt@klestadt.com
            jcorneau@klestadt.com
            creilly@klestadt.com

*Attorneys for the Debtor and Debtor-in-Possession*