SIDLEY AUSTIN LLP  
Michael G. Burke  
Dennis Kao  
787 Seventh Avenue  
New York, New York 10019  
Telephone: (212) 839-5300  
Facsimile:  (212) 839-5599  
mgburke@sidley.com  
dkao@sidley.com  

*Counsel for Wilmington Trust, N.A.,*  
*solely in its capacity as Trustee*

Hearing Date: February 14, 2019 at 10:00 a.m.

**UNITED STATES BANKRUPTCY COURT**  
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>1141 REALTY OWNER LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 18-12341 (SMB)<br><br>Jointly Administered |

**SUR-REPLY TO DEBTOR'S REPLY IN FURTHER SUPPORT OF OBJECTION TO CLAIM NO. 14, FILED BY WILMINGTON TRUST, N.A., SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE TRUST 2015-C28, COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2015-C28**

Wilmington Trust, N.A., solely in its capacity as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-C28, Commercial Mortgage Pass-Through Certificates, Series 2015-C28, (the "**Trustee**") and RMezz Flatiron LLC ("**RMezz**" and together with the Trustee, the "**Secured Lender**") acting by and through the special servicer, Midland Loan Services, a division of PNC National Bank, N.A. (the "**Special Servicer**") as its authorized agent pursuant to that certain Pooling and Servicing Agreement dated May 1, 2015, and the agreements entered into in connection therewith, with respect to a secured loan

---

[1] The Debtors herein and the last four digits of their respective tax identification number are: 1141 Realty Owner LLC (1804) and Flatironhotel Operations LLC (4773). The Debtors' principal place of business is 9 West 26th Street a/k/a 1141 Broadway, New York, New York.

1

agreement executed prepetition by Owner, hereby submits this sur-reply (this "**Sur-Reply**") to the reply [Docket No. 105] (the "**Reply**") of 1141 Realty Owner LLC's ("**Owner**" or a "**Debtor**", collectively with Flatironhotel Operations LLC, the "**Debtors**") in further support of its objection [Docket No. 84] ("**Objection**") to Claim No. 14 filed by the Trustee (the "**Claim**").[2] In support of this Sur-Reply, the Trustee respectfully states as follows:

## INTRODUCTION

1.  In its Reply, the Debtor seeks to distract attention away from the plain language of the Loan Agreement and the express conditions to payment of the Yield Maintenance Default Premium by focusing on acceleration. But whether the Loan has been accelerated has *no bearing* on whether the Yield Maintenance Default Premium is due because the Secured Lender is not seeking allowance of a prepayment premium or make-whole conditioned on voluntary prepayment or early redemption (in those cases, prepayment could not occur post-acceleration). Rather, the Yield Maintenance Default Premium is clearly and unambiguously owed under section 2.3.3 of the Loan Agreement because (i) an Event of Default exists and (ii) payment of the Debt (in part or in full) will occur in connection with the Debtors' plan of reorganization or otherwise, either through tender by the Debtor or recovery by the Secured Lender. Accordingly, the fact that Secured Lender accelerated the Loan after the Debtor's numerous defaults in no way affects the Secured Lender's contractual right to payment of the Yield Maintenance Default Premium – a valid and enforceable stipulated damages provision agreed to by these sophisticated parties that is contractually owed after default, upon tender by the Debtor or recovery by the Secured Lender.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Claim, the Loan Agreement, or the response of the Secured Lender filed in support of the Claim [Docket No. 94] (the "**Response**"). This Sur-Reply incorporates the Claim in its entirety by reference.

2. The Debtor thus mischaracterizes the case law and ignores the overarching principles and policy set forth therein, which allows yield maintenance premiums if the contract expressly provides for them under the circumstances. Courts have looked specifically at clauses like section 2.3.3 of the Loan Agreement, and found that they are enforceable payment provisions. Indeed, in some cases, courts have referred to clauses like section 2.3.3 as "evasion" clauses, because their aim is to prevent a borrower from circumventing payment of a yield maintenance premium. As in those cases, section 2.3.3 is an unambiguous clause that ensures the Yield Maintenance Default Premium is due following an Event of Default if any "payment" of the Debt occurs, thus rendering the question of whether the payment was made prior to, or after, the accelerated maturity wholly irrelevant.

3. Section 2.3.3 is therefore fundamentally different from the contractual language at issue in cases cited by the Debtor in which acceleration was relevant because in those cases, the contractual obligation to pay the premium was either specifically dependent on acceleration or on a *prepayment* of the debt. That is not the case here. The parties specifically bargained for a different contractual arrangement.

4. Accordingly, the key question is not whether the Loan has been accelerated, but rather, in accordance with the terms of section 2.3.3, (i) whether an Event of Default has occurred and (ii) if payment of the Debt is being tendered by the Debtor and/or recovered by the Secured Lender after any Event of Default. The answer to those two questions is yes.

5. First, the Debtor does not, and cannot, dispute that defaults have occurred (as set forth in the Response), well before the Debtor's chapter 11 filing,[3] and despite the Debtor's attempts to downplay these defaults as "non-monetary," they are unambiguously defined to be

---

[3] Moreover, the Secured Lender asserts that some of the Events of Default in question first arose in January 2016.

3

Events of Default under section 7.1 of the Loan Agreement. Second, the Debtor's Plan itself acknowledges that the Debtor intends to tender payment in full satisfaction of the Debt.[4]

6. In sum, the payment of the Yield Maintenance Default Premium is required by the Loan Agreement, and under New York law, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. Therefore, the Yield Maintenance Default Premium should be allowed by this Court.

## SUR-REPLY

### I. The Loan Agreement Clearly and Unambiguously Requires Allowance of the Yield Maintenance Default Premium

7. As in the Objection, the Debtor's Reply misstates the law and misunderstands the Loan Agreement. The Reply erroneously asserts that the only time a yield maintenance premium can be payable is if the Loan Agreement says it is payable after acceleration or "some variant of the word 'acceleration.'" Reply ¶ 12. Under New York law, courts look to the contract to determine whether a borrower is obligated to pay a yield maintenance premium after default and acceleration. *See, e.g.*, *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 259–60 (2011) ("It is the role of the courts to enforce the agreement made by the parties – not to add, excise or

---

[4] Perhaps knowing that its contractual argument is weak, Debtor also posits an entirely spurious and unfounded argument in a footnote that any such premium that is due could somehow be construed as "unreasonable." The Debtor presents no evidence or argument as to how the Yield Maintenance Default Premium could possibly be unreasonable. Indeed, the Yield Maintenance Default Premium is entirely consistent with the principle of protecting the Secured Lender's yield expectations, and is defined to be "the greater of (i) three percent (3%) of the principal amount of the Loan being repaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being repaid provided that the Note shall be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over (b) the principal amount of the Loan being repaid."

In other words, the premium is either 3% of the repaid principal amount (which is less than the interest rate on Note A and Note B) or the Secured Lender's loss as a result of the early payment. *See e.g.*, *In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 140–43 (2d Cir. 1982) (holding that two lenders' claims for liquidated damages representing 7.6% and 7.8% respectively of the principal amounts due were not plainly disproportionate to the lenders' loss); *In re Fin. Ctr. Assocs. of E. Meadow, L.P.*, 140 B.R. 829, 837–38 (Bankr. E.D.N.Y. 1992) (holding that a pre-payment charge that represented 24.9% of the principal amount due was not plainly disproportionate to the possible loss).

distort the meaning of the terms they chose to include, thereby creating a new contract under the guise of construction.") (citations omitted).

8. As detailed in the Response, the parties provided in the Loan Agreement that the Yield Maintenance Default Premium is due following an Event of Default if any *payment* of the Debt is tendered by the Debtor or otherwise recovered by the Secured Lender. *See* Loan Agreement § 2.3.3. Thus, payment of the Yield Maintenance Default Premium is ***not*** conditioned on a "prepayment" of the Debt, and acceleration simply has no impact on whether "payment" of the Debt can be made. The only timing that matters is that the payment occurs ***after default***.

9. Indeed, while courts have held that a lender may not be entitled to ***prepayment*** consideration after acceleration unless the loan agreement provides that a prepayment premium is due after acceleration,[5] courts have also recognized that borrowers can abuse this principle by defaulting and triggering acceleration, allowing them to repay the debt without having to pay the premium. *U.S. Bank. Nat'l Ass'n v. S. Side House, LLC*, 451 B.R. 248, 269 (Bankr. E.D.N.Y 2011). Courts have reasoned that to prevent this abuse, parties can agree to an "evasion clause" designed to "penalize any attempt on the part of the borrower to prepay without including paying the [prepayment] premium." *Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 834 (Sup. Ct. 2006). Evasion clauses work by *deeming* a "payment" made under certain specified circumstances a "prepayment." *S. Side House, LLC*, 451 B.R. at 269–70 (citing the following language as an example of an evasion clause: "a borrower's repayment of the debt after acceleration . . . *will be deemed* an evasion of the parties' prepayment agreement and the

---

[5] Courts have reasoned that because acceleration brings forward the maturity date of the loan, there can, by definition, no longer be any ***prepayment*** of the loan. *In re MPM Silicones, L.L.C.*, No. 14-22503, 2014 WL 4436335, at *12 (Bankr. S.D.N.Y. Sept. 9, 2014) ("*Momentive I*"), aff'd, 531 B.R. 321 (S.D.N.Y. 2015) ("*Momentive II*"), aff'd in relevant part, *Momentive Performance Materials Inc. v BOKF, NA, et al*, 874 F.3d 787, 802 (2d Cir. 2017) ("*Momentive III*").

borrower will be required to pay prepayment consideration or an equivalent amount."). Evasion clauses thus make the acceleration of a loan's maturity date irrelevant to whether a prepayment consideration is required.[6] It does not matter if a loan's maturity date is accelerated prior to the payment (preventing any subsequent payment from being an actual prepayment by definition) because the parties to such an agreement have already acknowledged that these payments are not actual prepayments by definition. Instead, these payments will be *deemed* prepayments that trigger the prepayment penalty, regardless of acceleration.

10. Courts look to the terms of the contract to determine what events trigger payment of the prepayment penalty. *Id.* at 270 (noting that the terms of an evasion clause "will define the parameters of the borrower's obligation to make" the prepayment consideration). For example, in *AE Hotel* the loan documents contained a very similar clause to section 2.3.3 that provided that if after an event of default:

> [AE Hotel] shall tender *payment* of an amount sufficient to satisfy the Debt at any time prior to a sale of the Mortgaged Property . . . either through foreclosure or the exercise of the other remedies available to [the lender], such tender by [AE Hotel] *shall be deemed to be a voluntary prepayment*.

321 B.R. 209, 219 (Bankr. N.D. Ill. 2005) (emphasis added). The court found that this provision imposed two conditions to deem a payment a prepayment – (1) a payment of the debt (2) that "occurs before a foreclosure sale or some other sale resulting from [the lender's] remedies under the Mortgage." *Id.* Once these two conditions were satisfied, "the payment was a 'prepayment,' notwithstanding [the lender]'s earlier acceleration of the debt." *Id.* The court held that the loan

---

[6] Evasion clauses also eliminate the need for lenders to prove borrowers intentionally avoided the prepayment premium because any payment made after acceleration is "deemed" voluntary and an avoidance. *Nw. Mut. Life Ins. Co.*, 816 N.Y.S.2d at 839.

6

documents "expressly provided for a prepayment premium even when the debt is accelerated." *Id.*[7]

11.    Similarly, section 2.3.3 of the Loan Agreement provides that "[i]f, following an Event of Default, payment of all or any part of the Debt is tendered by Borrower or otherwise recovered by Lender, such tender or recovery *shall be deemed* a voluntary prepayment by Borrower" and the Yield Maintenance Default Premium would be due. *See* Loan Agreement § 2.3.3 (emphasis added). This can be construed as an evasion clause because the parties agreed that a "payment" of all or any part of the Debt made by Borrower or recovered by Lender after an event of default shall be *deemed* a "voluntary prepayment." In this case, and as admitted in the Reply, there are two conditions in section 2.3.3 that trigger the Yield Maintenance Default Premium obligation: (1) there must have been an Event of Default under the Loan Agreement and (2) following that Event of Default payment of all or part of the Debt is tendered by the Borrower or otherwise recovered by Lender. Reply ¶ 18; Loan Agreement § 2.3.3. These two conditions are satisfied.

12.    First, Events of Default exist under the Loan Agreement. Response ¶¶ 11–12 (citing Debtor's defaults including, but not limited to: failing to maintain a valid and effective liquor license in violation of section 7.1(xii); failing to deposit rent and income into the existing cash management accounts in violation of section 7.1(xvi); failing to pay required Taxes in

---

[7] Moreover, the Debtor's attempt at distinguishing *AE Hotel* fundamentally contradicts its entire argument that there needs to be some "variant of the word 'acceleration'" expressly provided in the loan agreement in order for the Yield Maintenance Default Premium to be payable. Reply at ¶¶ 12–13. The Debtor contends that even though the contractual language in *AE Hotel* did not expressly include the word "acceleration" and specified only that the premium was due after default, the "provision itself anticipated the payment of the premium subsequent to acceleration of the debt" because the lender could only foreclose or exercise remedies after "acceleration of the debt." Reply at ¶ 13. In other words, the Debtor suggests that the "acceleration" was implied so the word did not need to be expressly stated in the loan agreement. However, the condition in *AE Hotel* is satisfied if a payment is made at *any time prior* to foreclosure or exercise of remedies, and is in no way connected to acceleration. Indeed, the debtor in that case attempted to make the same argument as the Debtor here, which the *AE Hotel* court rejected, holding that the loan agreement made "acceleration equally irrelevant" by conditioning the premium on a payment, and not prepayment. *AE Hotel*, 321 B.R. at 219.

7

violation of sections 4.1.2 and 7.1(xvi); permitting a lien to be recorded against the Property in violation of sections 4.1.2 and 7.1(xvi)). Contrary to the Debtor's implication in its Reply, Events of Default under the Loan Agreement include both monetary and non-monetary breaches. *See, e.g.*, Loan Agreement §§ 7.1(xii), (xvi) (stating in the lead-in that each of the enumerated events "shall constitute an event of default hereunder (an 'Event of Default')" and including "any required license, permit, including, without limitation the Liquor License, relating to the Property ceases to be in full force and effect" and any continuing default under any term, covenant or condition of the Loan Documents); *see also Quadrant Structured v. Vertin*, 23 N.Y.3d 549, 559–60 (2014) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."). Second, the Debtor has also committed to tendering payment of the Debt through its anticipated plan of reorganization.[8] *See* Reply ¶ 18 n.4; Plan of Reorganization Art. III (providing for payment in full of all Secured Lender's claims) [Docket No. 102]. Therefore, section 2.3.3 requires payment of the Yield Maintenance Default Premium, whether or not the Debt has been accelerated.

13. Debtor makes much of the fact that section 2.3.3 of the Loan Agreement does not specifically state the word "acceleration." But contrary to the Debtor's suggestion, the omission of the word "acceleration" is entirely consistent with the obligation to pay the Yield Maintenance Default Premium because payment is not conditioned on acceleration of the debt – acceleration is ***irrelevant***. *AE Hotel*, 321 B.R. at 219 ("Although these provisions do not mention 'acceleration' directly as the provision in *Schaumburg Hotel* did, they make acceleration equally irrelevant.").[9] As stated above, section 2.3.3 of the Loan Agreement is an evasion clause that

---

[8] Alternatively, any effort by the Secured Lender to seek recovery of the Debt would also satisfy this condition.

[9] Moreover, the court in *Nw. Mut. Life Ins. Co.* cited to *TMG* as providing a "comprehensive clause" for payment of a premium. *See Nw. Mut. Life Ins. Co.*, at 816 N.Y.S.2d at 837–38. In *TMG*, the court found that a prepayment premium was enforceable because the contractual language specifically provides:

8

"define[s] the parameters of the borrower's obligation to make" the Yield Maintenance Default Premium. *S. Side House, LLC*, 451 B.R. at 270. Any payment or partial payment made or recovered after an event of default is *deemed* a prepayment. There was no reason for the parties to mention acceleration because when these two conditions are satisfied it does not matter whether the loan was accelerated or not, the Yield Maintenance Default Premium is due.

14. Moreover, the cases cited by the Debtor in which the contract specifically mentioned "acceleration" are inapposite because the obligation to pay premiums in those cases was triggered by a default *and acceleration*. *See In re Madison 92nd Street Associates, LLC*, 472 B.R. 189, 196 (Bankr. S.D.N.Y. 2012) ("*If the Loan is accelerated* during the Lockout Period for any reason other than casualty or condemnation, Borrower shall pay, in addition to all other amounts outstanding under the Loan documents, a prepayment premium equal to five percent (5%) of the outstanding balance of the Loan.") (emphasis added); *In re 400 Walnut Associates, L.P.*, 461 B.R. 308, 320 (Bankr. E.D. Pa. 2011) ("*Upon Lender's exercise of any right of acceleration* under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, (A) all accrued interest and all other sums due Lender under this Note and the other Loan Documents, and (B) the prepayment premium calculated pursuant to Schedule A.") (emphasis added); *see also Nw. Mut. Life Ins. Co.*, 816 N.Y.S.2d at 835 (comparing a clause that is predicated on default and acceleration with the evasion clause in the Note and stating "[h]ere it is *not* default and

---

> The whole of the principal sum and interest, together with the prepayment premium (as defined herein) and the costs and attorneys' fees incurred by the Holder hereof in collecting or enforcing payment thereof, shall become due and payable at the option of the Holder hereof, after default in the receipt of payment of any principal hereof, interest thereon, or the payment of any other sum due hereunder or under the terms of the Mortgages or the Security Documents, or after any other default in the performance of the covenants or terms of this Note or the Mortgages or the Security Documents securing this Note or any other Event of Default as such term is defined in the Mortgages or Security Documents, without notice, which notice is hereby waived by Borrower.

21 Kan App 2d 234, 249 (1995). This comprehensive clause did not specifically mention "acceleration"

acceleration which causes the prepayment premium to become due and payable. Instead, 'prepayment' is the predicate for a claim to the premium, albeit when it is attempted after default and acceleration. Unlike the former, which is automatic upon default and acceleration, the latter is not.").

15.  Nor do *AMR* and *Momentive* help the Debtor. Those cases are clearly distinguishable because the relevant debt documents only provided for the prepayment premium to be paid in the event of a voluntary *prepayment* or redemption – unlike the terms of section 2.3.3.[10] *In re AMR Corp.*, 730 F.3d 88, 94, 103 (2d Cir. 2013); *Momentive I*, 2014 WL 4436335, at *11–12. The courts in *AMR* and *Momentive* held that the borrowers did not make a *prepayment* because acceleration advanced the maturity date of the loans and *prepayments* can only occur prior to the maturity date. *In re AMR Corp.*, 730 F.3d at 94, 103; *Momentive I*, 2014 WL 4436335, at *12. The *AMR* and *Momentive* holdings have no bearing on how to interpret evasion clauses like section 2.3.3 because those cases did not deal with all *payments*. Unlike *AMR* and *Momentive*, the parties to the Loan Agreement agreed that any *payments* tendered or recovered following an Event of Default would be *deemed* prepayments and the Yield Maintenance Default Premium would be due and owing. In other words, the parties agreed that the payments specified under section 2.3.3 would trigger the Yield Maintenance Default Premium obligation, notwithstanding acceleration and advancement of the maturity date. *S. Side House, LLC*, 451 B.R. at 269 ("[P]arties may agree that even after default and acceleration, or

---

[10] The contractual language was extensively analyzed in the Response, demonstrating the clear and unambiguous intent of the parties was to require payment of the Yield Maintenance Default Premium following an Event of Default upon any payment of the Debt. *See* Response ¶¶ 30-42. Indeed, the Response shows that the parties were careful to distinguish "payment" from "prepayment" in sections 2.3.1 through 2.3.4 of the Loan Agreement. *See* Response ¶¶ 30–33. Moreover, the Loan Agreement itself contemplates two different types of premiums, a Yield Maintenance Default Premium and Yield Maintenance Premium. As defined, the Yield Maintenance Default Premium applies to instances in which the "Loan [is] being *repaid*," whereas the Yield Maintenance Premium applies to instances in which the "Loan [is] being *prepaid*." *See* Loan Agreement § 1.1.1 (emphasis added).

10

where the borrower's prepayment is otherwise involuntary, an amount that is equivalent to prepayment consideration may nevertheless be due.").

**II.  The Secured Lender Is Entitled to Recover the Yield Maintenance Default Premium on the Separate Ground that Owner's Voluntary Actions Caused the Events of Default**

16.   Courts do not allow a borrower to evade payment of a premium by causing a default through its voluntary actions, regardless of whether the borrower had subjective intent to evade such payment, because allowing such evasion would "place [the borrower] in a better position by *breaching* the [agreement] than it would have occupied had it honored the parties' contract." *FSB v. Cash America Int'l, Inc.*, Case No. 15-cv-5027 (JMF), 2016 WL 5092594, at *6–8 (S.D.N.Y. Sept. 19, 2016). Here it was Owner's voluntary actions that breached the Loan Agreement, such as failing to maintain a valid liquor license, unilaterally failing to pay New York State and New York City taxes and failing to enter into a Secured Lender-approved Replacement Management Agreement to manage the Property. *See* Response ¶¶ 11–12. Owner should not be permitted to avoid its obligation to pay the bargained-for Yield Maintenance Default Premium that is due in precisely such a default scenario caused entirely by Owner's own actions, simply because the Secured Lender exercised its right of acceleration.

17.   The Debtor criticizes the logic of *Cash America*'s holding that the borrower's subjective intent is not relevant, but it does not dispute the case's holding that a debtor should not be able to evade paying a yield maintenance premium by causing a default through voluntary actions. Instead, Debtor attempts to characterize its voluntary actions as involuntary by calling them "non-monetary" and saying it was not "actively taking steps to breach the agreement for its own benefit." But, as discussed above, the parties agreed that both monetary and non-monetary defaults under the Loan Agreement. *See, e.g.*, Loan Agreement §§ 7.1(xii), (xvi). Moreover,

11

*Cash America* tells us that "voluntary" does not mean "bad faith" so it is irrelevant whether Debtor defaulted for its own benefit or not. *Cash America*, 2016 WL 5092594, at *7.

## **RESERVATION OF RIGHTS**

18.   To the extent the Debtors seek to raise any additional objections to the Claim, the Secured Lender reserves all rights to amend, supplement, revise, or otherwise respond to such objections on any and all additional factual or legal grounds relevant to the Claim, and, without limiting the foregoing, to (i) amend the Claim or Sur-Reply, (ii) file additional papers in support of the Claim, and (iii) take any and all other appropriate actions to respond to any further objection to the Claim based on any and all grounds.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Secured Lender respectfully requests that the Court overrules the Objection and enters an order allowing the Claim as a secured claim in an amount of not less than $32,048,285.29, allowing the Yield Maintenance Default Premium, and granting such other relief as the Court deems just and proper under the circumstances.

| | |
|---|---|
| Dated: February 5, 2019<br>New York, New York | **SIDLEY AUSTIN LLP**<br>*/s/ Michael G. Burke*<br>Michael G. Burke<br>Dennis Kao<br>787 Seventh Avenue<br>New York, NY 10019<br>Telephone: (212) 839-5300<br>Facsimile: (212) 839-5599<br><br>*Counsel for Wilmington Trust, N.A., solely in its capacity as Trustee* |