UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                          :
                                                                :
1141 REALTY OWNER LLC, *et al.*,               :         Chapter 11
                                                                :         Case No. 18-12341 (SMB)
                         Debtors.                          :         (Jointly Administered)
------------------------------------------------------------X

# MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT REGARDING THE ENFORCEABILITY OF YIELD MAINTENANCE DEFAULT PREMIUM

**A P P E A R A N C E S:**

KLESTADT WINTERS JURELLER
  SOUTHARD & STEVENS, LLP
200 West 41st Street, 17th Floor
New York, New York 10036

    Tracy L. Klestadt, Esq.
    Joseph C. Corneau, Esq.
    Christopher Reilly, Esq.
       Of Counsel

*Attorneys for Debtor and
Debtor-in-Possession*

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019

    Michael G. Burke, Esq.
    Dennis Kao, Esq.
       Of Counsel

*Attorneys for Wilmington Trust, N.A.,
solely in its capacity as Trustee*

BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue
New York, New York 10002

    Mark A. Frankel, Esq.
       Of Counsel

*Attorneys for TCG Debt Acquisitions 2 LLC*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      1141 Realty Owner LLC ("Debtor") owns the Flatiron Hotel, a 62-room hotel located at 9 West 26th Street a/k/a 1141 Broadway, New York, New York ("Property"). The Property is encumbered by a mortgage currently held by Wilmington Trust, N.A. ("Wilmington") solely in its capacity as Trustee for the benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-C28, Commercial Mortgage Pass Through Certificates, Series 2015-C28. Wilmington filed a proof of claim ("*Claim*") (ECF Doc. # 129) in the approximate sum of $32 million. The *Claim* includes a "make-whole" or yield maintenance premium, defined below, in the approximate sum of $3.1 million. The Debtor objected, *inter alia*, to the enforceability of the make-whole premium[1] and Wilmington filed a response[2] that the parties agreed the Court could treat as a motion for summary judgment on that issue.

      For the reasons that follow, the *Motion* is granted to the extent of concluding that the make-whole premium at issue is enforceable under New York law, and the Debtor's corresponding objection is overruled.

---

[1]     *Debtors' Objection to Claim No. 14 filed by Wilmington Trust, N.A., Solely in its Capacity as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-C28, Commercial Mortgage Pass Through Certificates, Series 2015-C28*, dated Nov. 16, 2018 ("*Claim Objection*") (ECF Doc. # 84).

[2]     *Response to Debtor's Objection to Claim No. 14, Filed by Wilmington Trust, N.A. Solely in its Capacity as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-C28, Commercial Mortgage Pass Through Certificates, Series 2015-C28*, dated Dec. 13, 2018 ("*Motion*") (ECF Doc. # 94).

**BACKGROUND**

The material facts are not in dispute. On April 16, 2015, the Debtor entered into a loan agreement ("*Loan Agreement*") with Wilmington's predecessor in interest, Rialto Mortgage Finance, LLC ("Rialto"). (*Motion* at ¶ 6.)[3] Contemporaneously, the Debtor executed two promissory notes (Note A and Note B, and collectively, the "Notes") for a combined amount of $25 million, secured by a mortgage on the Property. (*Id.*)[4] The "Maturity Date" of the loan was "the Stated Maturity Date [May 6, 2025] *or such other date* on which the final payment of the principal of the Note becomes due and payable as therein or herein provided, *whether at such stated maturity date, by declaration or acceleration*, or otherwise." (*Loan Agreement* at p. 7, § 1.1.2 (emphasis added).) Rialto subsequently assigned the mortgage, along with the *Loan Agreement* and Notes (collectively, the "Loan Documents"), to Wilmington. (*Claim* at Exhibit E; *see also id.* at Exhibit F (assigning leases and rents to Wilmington).) The *Loan Agreement* is governed by New York law. (*Loan Agreement* at § 9.3.)

**A.    Default and Acceleration**

On September 15, 2017, Wilmington's counsel sent a Notice of Default and Acceleration ("September Default Notice"), informing the Debtor "that it is in default of its obligations under the Loan Documents in that, among other things, [the Debtor] has failed to maintain valid and effective liquor licenses issued by the New York Liquor Authority permitting [the Debtor] to serve alcoholic beverages at the Property." (*See Motion* at ¶ 11.) The *Loan Agreement* provided a host of available remedies following an

---

[3]    The *Loan Agreement* is attached as Exhibit A to the *Claim*.

[4]    The Notes and the mortgage are attached as Exhibits B and C, respectively, to the *Claim*.

Event of Default, including the acceleration of the debt, (*see Loan Agreement* at § 7.2), and Wilmington's remedies were cumulative and not exclusive of any other right under the Loan Documents.  (*Id.* at §§ 7.2, 7.3.)   Wilmington opted to "accelerate[] and demand[] immediate repayment in full of the entire outstanding indebtedness due under the Note, Mortgage, and the Loan Documents in the principal sum of $24,209,357.00 together with all accrued interest thereon . . . and all other sums due under the Loan Documents."[5]  (September Default Notice.)  On October 11, 2017, Wilmington's servicer sent the Debtor a Notice of Additional Defaults ("October Default Notice").[6]  The *Claim Objection* and *Debtor's Reply in Further Support of Objection to Claim No. 14*, dated January 22, 2019 ("*Reply*") (ECF Doc. # 105) do not contest the Debtor's defaults under the Loan Documents although the Debtor insists that its default was not intentional.

## B. The Make-Whole Premium

The present dispute centers on Wilmington's entitlement to the "Yield Maintenance Default Premium" defined in the *Loan Agreement* as the:

> amount equal to the greater of: (i) three percent (3%) of the principal amount of the Loan being repaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being repaid provided that the Note shall be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over

---

[5]     The September Default Notice is attached to the *Claim* as part of Exhibit H.  The Debtor points out that the September Default Notice "demands payment of the Yield Maintenance Default Premium [defined in the succeeding text]," (*Reply* at ¶ 16 n. 3), but I assume the Debtor means "does not demand payment," *etc*.  The next sentence in the *Reply* implies that the current demand for the allowance of the Yield Maintenance Default Premium is inconsistent with the September Default Notice.  Suffice it to say the September Default Notice demands "all other sums due under the Loan Documents," which includes the Yield Maintenance Default Premium.  There is no inconsistency, only a different degree in specificity.

[6]     The October Default Notice is also attached to the *Claim* as Exhibit H.

(b) the principal amount of the Loan being repaid.

(*Loan Agreement* at p. 13, § 1.1.2.)[7]  With certain exceptions that do not apply, the Debtor could not prepay the loan prior to the Maturity Date except in accordance with the *Loan Agreement*.  (*Id.* at § 2.3.1.)  Furthermore, any payment following an Event of Default was deemed a "voluntary prepayment" requiring the payment of the Yield Maintenance Default Premium:

> If, *following an Event of Default* which occurs prior to Free Window Date, payment of all or any part of the Debt is tendered by Borrower or otherwise recovered by Lender, such tender or recovery *shall be deemed a voluntary prepayment* by Borrower in violation of the prohibition against prepayment set forth in Section 2.3.1 and Borrower shall pay, in addition to the Debt, (i) an amount equal to the *Yield Maintenance Default Premium* . . . .

(*Id.* at § 2.3.3 (emphasis added).)[8]

**C.    The Bankruptcy**

The Debtor and an affiliate filed voluntary petitions for chapter 11 relief in this Court on July 31, 2018 and Wilmington filed the *Claim* three months later asserting an amount "not less than" $32,048,285.29.  This sum included $3,108,096.78 allocated to the Yield Maintenance Default Premium.  (*Schedule to Proof of Claim of Wilmington Trust, N.A.* at p. 6, ¶ 17.)[9]  The Debtor objected arguing that the Yield Maintenance Default Premium is unenforceable as a matter of New York law because Wilmington had

---

[7]    The *Loan Agreement* also provides for a Yield Maintenance Premium, (*Loan Agreement* at p. 14, § 1.1.2.), a different premium, that is not at issue.

[8]    The Free Window Date is "the Payment Date four (4) months prior to the Stated Maturity Date." (*Id.* at p.1, § 1.1.1.)

[9]    The *Claim Objection* states the asserted Yield Maintenance Default Premium is $2,542,737.63, (*Claim Objection* at ¶ 10), but that figure only accounts for the premium attributable to one Note, not both.  In addition, the *Claim Objection* challenges the entire *Claim* based on lack of documentation.  (*Id.* at ¶¶ 6-8.)  That aspect of the *Claim Objection* is not at issue on the *Motion*.

5

accelerated the debt, and hence, the Maturity Date, and the acceleration requires disallowance of the prepayment premium. (*Claim Objection* at ¶¶ 10, 11.) Wilmington responded that the Yield Maintenance Default Premium is allowable under the unambiguous terms of section 2.3.3. In essence, the latter section governs any post-default payment, not just prepayments, and merely "deems" the post-default payment to be a "prepayment" for the purpose of the Yield Maintenance Default Premium.

In response, the Debtor contended that courts will only uphold prepayment premiums after acceleration where the applicable loan agreement expressly provides that the premium is due following an acceleration and uses the word "acceleration," or some other variant. (*Reply* at ¶ 12.) Because the word "acceleration" is "conspicuously absent" from the relevant provision of the *Loan Agreement*, (*id.* at ¶ 16), Wilmington's acceleration of the debt precludes entitlement to a Yield Maintenance Default Premium. The *Reply* also claimed there is no evidence that the Debtor subjectively intended to default. (*Id.* at ¶¶ 19, 20.)

## DISCUSSION

### A. New York Contract Principles

When asked to interpret contractual language, the question under New York law is "whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). Ambiguity presents a question of law. *Id.* A contract is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and

6

who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks and citation omitted); *accord Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010); *Maverick Tube*, 595 F.3d at 466. An agreement is not ambiguous if it has a definite and precise meaning, and unambiguous language does not become ambiguous because a party urges a different interpretation that strains the language beyond its ordinary meaning. *Maverick Tube*, 595 F.3d at 467; *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Where the dispute concerns a provision of the contract, the Court must consider the contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases," *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007); *accord Maverick Tube*, 595 F.3d at 468, and "seek to give '[e]ffect and meaning . . . to every term of [a] contract.'" *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 284 (S.D.N.Y. 2012) (quoting *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996)).

If the contract is ambiguous, "'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir. 1998)). If no extrinsic evidence exists, the court may determine the meaning of the contract as a question of law. *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir. 2000); *Hartford Acc. & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973) ("[I]f the equivocality must be resolved wholly without reference to extrinsic evidence the issue is to be determined

7

as a question of law for the court."). The parties have represented that no extrinsic evidence exists that would shed light on the interpretation of the *Loan Agreement*, and consequently, its meaning presents a pure question of law.

**B.    Make-Whole Premiums**

Under the "perfect tender" rule, "a mortgagor has no right to pay off his obligation prior to its stated maturity date in the absence of a prepayment clause in the mortgage or contrary statutory authority." *Arthur v. Burkich*, 520 N.Y.S.2d 638, 639 (N.Y. App. Div. 1987); *accord Wilmington Sav. Fund Soc'y, FSB v. Cash Am. Int'l, Inc.*, 15-CV-5027 (JMF), 2016 WL 5092594, at *5 (S.D.N.Y. Sept. 19, 2016); *In re Solutia, Inc.*, 379 B.R. 473, 487-88 (Bankr. S.D.N.Y. 2007). The rationale for the "perfect tender" rule is the lender's absolute right to receive the bargained for income stream over the life of the loan. *Wilmington Sav. Fund Soc'y,* 2016 WL 5092594, at *5; *U.S. Bank Nat'l Ass'n v. S. Side House, LLC*, No. 11-CV-4135 (ARR), 2012 WL 273119, at *4 (E.D.N.Y. Jan. 30, 2012); *Solutia*, 379 B.R. at 488; *Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 835 (N.Y. Sup. Ct. 2006). A prepayment or make-whole premium gives the borrower the option to prepay the loan and cut off the lender's income stream, *Nw. Mut. Life Ins. Co.*, 816 N.Y.S.2d at 835, and insures the lender against loss of the bargain if interest rates decline. *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984); *see Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir. 1982) ("The purpose of a redemption premium is to put a price upon the voluntary satisfaction of a debt before the date of maturity."); Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537, 538 (2007) ("[W]hen faced with a prepayment fee, the borrower will repay its debt only when the benefits from prepayment are greater than the fee. Prepayment clauses,

in sum, allow a lender to negotiate for yield protection and a borrower to negotiate for freedom of action.").

Generally, a lender that accelerates a loan following a default forfeits the right to a prepayment premium because the acceleration advances the maturity date, and by definition, the loan cannot be prepaid. *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp.* (*In re AMR Corp.*), 730 F.3d 88, 103 (2d Cir. 2013); *LHD Realty Corp.*, 726 F.2d at 330-31. Courts recognize two exceptions to this general rule. First, if a clear and unambiguous clause requires the payment of the prepayment premium even after default and acceleration, the clause will be analyzed as a liquidated damages clause. *S. Side*, 2012 WL 273119, at \*7; *Nw. Mut. Life Ins. Co.*, 816 N.Y.S.2d at 836; *see NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 491 (N.Y. 2011) ("The parties to a loan agreement are free to include provisions directing what will happen in the event of default or acceleration of the debt, supplying specific terms that supercede other provisions in the contract if those events occur."). Second, if the borrower intentionally defaults to trigger the acceleration and "evade" payment of the prepayment premium, the lender can enforce the prepayment premium. *S. Side*, 2012 WL 273119, at \*5; *Nw. Mut. Life Ins. Co.*, 816 N.Y.S.2d at 836; *see Sharon Steel Corp.*, 691 F.2d at 1053 ("We believe it undermines the plain purpose of the redemption provisions to allow a liquidating debtor to avoid their terms simply by failing to take the steps necessary to redeem the debentures, thereby creating a default.")[10]

---

[10]  In *Wilmington Sav. Fund Soc'y*, the District Court concluded that subjective intent to evade the prepayment premium is irrelevant. *See* 2016 WL 5092594, at \*7. Because the Court concludes that the *Loan Agreement* mandates the payment of the Yield Maintenance Default Premium, it does not decide this issue.

Section 2.3.3 mandates the payment of the Yield Maintenance Default Premium as a matter of New York contract law.  It imposes the make-whole premium in connection with any *payment* made after an Event of Default, not just a *prepayment* made after an Event of Default but before acceleration.  In fact, the word acceleration does not appear in the clause.  Instead, the clause *deems* the post-default payment, whenever made, to be a "voluntary prepayment" for the purpose of the Yield Maintenance Default Premium.  The Debtor does not dispute its pre-petition default, and consequently, the amount of the Yield Maintenance Default Premium must be added to the debt at the time of the first post-default payment of any part of the debt.

As a result, the Yield Maintenance Default Premium must be analyzed as a liquidated damages provision.  Whether a clause which prescribes liquidated damages is in fact an unenforceable penalty is a question of state law.  *In re United Merchs. & Mfrs., Inc.*, 674 F.2d 134, 141 (2d Cir. 1982); *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.)*, 23 B.R. 104, 111 (Bankr. S.D.N.Y. 1982).  A liquidated damages clause is valid under New York law if: (1) actual damages are difficult to determine, and (2) the sum is not "plainly disproportionate" to the possible loss.  *United Merchs.*, 674 F.2d at 142 (quoting *Walter E. Heller & Co. v. Am. Flyers Airlines Corp.*, 459 F.2d 896, 899 (2d Cir. 1972)); *Leasing Serv. Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir. 1982).  The enforceability of a liquidated damages provision must be decided based on the circumstances existing at the time the parties entered into their agreement.  *Walter E. Heller*, 459 F.2d at 898-99.

The party seeking to avoid the liquidated damages clause bears the burden of proving that it is a penalty and must demonstrate either that the damages flowing from

prepayment were readily ascertainable at the time the parties entered into the lending agreement or the prepayment premium is "conspicuously disproportionate" to the lender's foreseeable losses. *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005). This burden must be considered in light of the admonition that the historical distinction between liquidated damages and penalties has become increasingly difficult to justify, and courts should not interfere with the parties' agreement regarding liquidated damages "absent some persuasive justification." *GFI Brokers, LLC v. Santana*, No. 06 Civ. 3988 (GEL), 2009 WL 2482130, at *2 (S.D.N.Y. Aug. 13, 2009) (Lynch, J.) (internal citation and omitted); *JMD Holding Corp.*, 828 N.E.2d at 609-10.

The Debtor gives short shrift to this issue. The *Claim Objection* does not mention it and the *Reply* limits the discussion to a single footnote in which the Debtor declares that "the Yield Maintenance Default Premium became due prior to the Acceleration Notice because the Debtor made its regular loan payments after an Event of Default, the Yield Maintenance Default Premium must be considered an unenforceable penalty because the proposed damages here are plainly disproportionate to the Lender's loss absent a prepayment of the debt in full." (*Reply* at ¶ 18 n. 4.) Initially, the argument is made in a footnote, and arguments made in footnotes are not adequately raised and need not be considered. *LaMonica v. Tilton* (*In re TransCare Corp.*), 592 B.R. 272, 291 (Bankr. S.D.N.Y. 2018). Even if the Court considered the argument, it suffers from at least two shortcomings. First, it is bereft of any legal or factual analysis and the Debtor fails to show that the Yield Maintenance Default Premium is disproportionate to Wilmington's loss; it just says so. Second, in arguing that it is disproportionate, the

11

Debtor seems to compare the amount of the Yield Maintenance Default Premium to the amount of the first post-default loan payment that triggered it because the Debtor implicitly concedes that it would not be disproportionate if the entire debt is repaid. This is precisely what the Debtor intends to do under its proposed plan.

The Court's conclusion is consistent with *In re AE Hotel Venture,* 321 B.R. 209 (Bankr. N.D. Ill. 2005), which involved a similar make-whole provision. There, the debtor defaulted pre-petition, the lender accelerated the debt, and the debtor filed a chapter 11 and sold its real estate through a bankruptcy auction for more than the debt. *Id.* at 214. The debtor argued that once the lender accelerated the mortgage there could be no "prepayment," and the lender waived the prepayment premium by the acceleration. *Id.* at 218.

The bankruptcy court disagreed. It observed that while a lender typically loses a right to receive a prepayment premium by accelerating the debt, the parties may agree that a prepayment premium is due even after an acceleration. *Id.* at 218. Paragraph 5 of the Note provided that "if, after an event of default, '[AE Hotel] shall tender payment of an amount sufficient to satisfy the Debt at any time prior to a sale of the Mortgaged Property . . . either through foreclosure or the exercise of the other remedies available to [the Lender] under the Mortgage, such tender by [AE Hotel] shall be deemed to be a voluntary prepayment,'" *id.* at 218-19, and section 24 of the Mortgage contained virtually identical language. *Id.* at 219. The court concluded that these provisions, which did not mention "acceleration," made acceleration "irrelevant." *Id.* Any *payment* made after default but before a foreclosure or some other sale prompted by the lender's remedies was deemed a voluntary prepayment. *Id.* Since the bankruptcy sale was not a

12

foreclosure sale or a sale resulting of the lender's exercise of its remedies, the premium became due. *Id.*

Although the enforceability of the make-whole premium in *AE Hotel* was decided under Illinois law, the same result follows under New York law: the parties contracted to deem any post-default payment to be a "voluntary prepayment" that triggered the Yield Maintenance Default Premium. (*Loan Agreement* at § 2.3.3.) The Debtor attempts to distinguish *AE Hotel* arguing that the term "acceleration" was implied if not expressed in the section of the *AE Hotel* Note that mandated payment of the make-whole premium following a default. According to the Debtor, the *AE Hotel* make-whole provision required the payment of the premium if the debt was paid at any time prior to a foreclosure sale, a foreclosure sale could only occur after acceleration, and therefore, the provision anticipated payment of a premium after the acceleration of the debt. (*Reply* at ¶ 13.) The argument ignores the bankruptcy court's express conclusion that acceleration was irrelevant under the make-whole provision.

In addition, the Debtor's authorities are distinguishable. The Debtor reads the Second Circuit's decisions in *Momentive Performance Materials Inc. v. BOKF, N.A.* (*In re MPM Silicones, L.L.C.*), 874 F.3d 787 (2d Cir. 2016) and *AMR Corp.*, 730 F.3d 88, as holding that a lender forfeits a prepayment premium as a matter of law by accelerating the debt. (*Claim Objection* at ¶¶ 10, 11; *Reply* at ¶ 17.) But parties can and here did contract around the general rule, and Wilmington's rights depend on the terms of the *Loan Agreement*, not upon the wholly different agreements in *MPM* and *AMR*. In *AMR*, the relevant provisions of the Indenture explicitly stated that in the event of an automatic acceleration, which had occurred, no make-whole premium was due. *AMR*,

13

730 F.3d at 99-100, 104-05.  In *MPM*, the relevant provision required the payment of a make-whole premium in the event of an optional redemption.  The Court concluded that the post-acceleration, post-bankruptcy payment was not an optional redemption because a redemption refers to a pre-maturity payment and "[a] payment made mandatory by operation of an automatic acceleration clause is not one made at MPM's option."  *MPM*, 874 F.3d at 802-03.  The *Loan Agreement* requires the payment of the Yield Maintenance Default Premium with any post-default payment and not only when there is an optional redemption.

Finally, the Debtor argues that the make-whole provision must expressly require the payment of the make-whole premium after acceleration and cites a string of cases that allowed a make-whole premium after acceleration where the relevant make-whole provision stated that the payment was due after default and acceleration.[11]  (*Reply* at ¶ 12.)  The short answer is parties can provide for their rights with any language that plainly conveys their intent.  One way to ensure that a make-whole premium is payable even after acceleration is to say so explicitly.  Another way to ensure that the make-whole premium is payable even after acceleration is to render acceleration irrelevant and, as here and in *AE Hotel*, make the premium contingent on any post-default payment.  Deeming the post-default payment to be a "voluntary prepayment" does not forfeit the Yield Maintenance Default Premium; it confirms the parties' intent that it

---

[11]    One of the Debtor's authorities, *Conn. Gen. Life Ins. Co. v. Schaumburg Hotel Owner Ltd. P'ship* (*In re Schaumburg Hotel Owner Ltd. P'ship*), 97 B.R. 943 (Bankr. N.D. Ill. 1989) was addressed in *AE Hotel*.  The *Schaumburg Hotel* note required the payment of the make-whole premium after the exercise of any acceleration clause following a default.  *Id.* at 953.  The *AE Hotel* court observed that the make-whole provision it was construing did not mention "acceleration" as the provision in *Schaumburg Hotel* did, but the provisions of the note in *AE Hotel* made acceleration irrelevant.  *AE Hotel*, 321 B.R. at 219. The same is true in the case of the *Loan Agreement*.

14

must be paid even if it is not an actual prepayment. Accordingly, the *Motion* is granted to the extent of concluding that the Yield Maintenance Default Premium is enforceable under New York law, and Debtor's corresponding objection is overruled. The parties should contact chambers to schedule a conference for the purpose of addressing the resolution of the balance of the Debtor's objection.

    So ordered.

Dated:  New York, New York
         March 18, 2019

                                            /s/ *Stuart M. Bernstein*
                                            STUART M. BERNSTEIN
                                United States Bankruptcy Judge