SIDLEY AUSTIN LLP
Michael G. Burke
Dennis Kao
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
mgburke@sidley.com
dkao@sidley.com

*Counsel for Wilmington Trust, N.A.,*
*solely in its capacity as Trustee*

**Hearing Date: April 16, 2019 at 10:00 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| 1141 REALTY OWNER LLC, *et al.*, | Case No. 18-12341 (SMB) |
| Debtors.[1] | Jointly Administered |

**OBJECTION TO (I) DISCLOSURE STATEMENT FOR FIRST AMENDED
PLAN OF REORGANIZATION FOR 1141 REALTY OWNER LLC AND
FLATIRONHOTEL OPERATIONS LLC UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE AND (II) FIRST AMENDED PLAN OF REORGANIZATION
FOR 1141 REALTY OWNER LLC AND FLATIRONHOTEL OPERATIONS LLC
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Wilmington Trust, N.A., solely in its capacity as Trustee for the Benefit of the Registered

Holders of Wells Fargo Commercial Mortgage Trust 2015-C28, Commercial Mortgage Pass-

Through Certificates, Series 2015-C28, (the "**Trustee**") and TCG Debt Acquisitions 2 LLC, as

successor to RMezz Flatiron LLC ("**TCG**" and together with the Trustee, the "**Secured Lender**"),

acting by and through the special servicer, Midland Loan Services, a division of PNC National

Bank, N.A. (the "**Special Servicer**") as its authorized agent pursuant to that certain Pooling and

---

[1] The Debtors herein and the last four digits of their respective tax identification number are: 1141 Realty Owner LLC
(1804) and Flatironhotel Operations LLC (4773). The Debtors' principal place of business is 9 West 26th Street a/k/a
1141 Broadway, New York, New York.

Servicing Agreement dated May 1, 2015, and the agreements entered into in connection therewith, with respect to a secured loan agreement executed prepetition by Owner, by and through its undersigned counsel, hereby submit this objection (this "**Objection**") to the (i) Disclosure Statement for First Amended Plan of Reorganization for 1141 Realty Owner LLC and Flatironhotel Operations LLC Under Chapter 11 of the Bankruptcy Code [Docket No. 122] (the "**Disclosure Statement**") and (ii) First Amended Plan of Reorganization for 1141 Realty Owner LLC and Flatironhotel Operations LLC Under Chapter 11 of the Bankruptcy Code [Docket No. 121] (the "**Plan**"), as filed by 1141 Realty Owner LLC ("**Owner**" or a "**Debtor**") and Flatironhotel Operations LLC (together with Owner, the "**Debtors**").[2] In support of this Objection, the Trustee respectfully states as follows:

## INTRODUCTION

1.    While the Trustee is, of course, supportive of a chapter 11 plan that would pay the Secured Lender's claim in full, this Plan fails to be such a plan. Perhaps recognizing this deficiency, the Debtors concocted this Plan, which improperly manufactures an impaired consenting class of "claims" and improperly describes the Secured Lender's claim as unimpaired, thereby avoiding the solicitation of the Secured Lender's vote. This scheme violates the statutory requirements for confirmation under the Bankruptcy Code, and therefore confirmation of the Plan should be denied.

2.    Specifically, the Plan improperly classifies Premier's DIP financing claim as Class 2 claims in order to create an impaired consenting class – notwithstanding the fact that the

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement.

Bankruptcy Code precludes administrative expense DIP financing claims from being classified as a class of claims that can vote on a plan of reorganization.

3.      Moreover, the Plan incorrectly treats the Secured Lender's Class 3 claim as "unimpaired," when it is in fact an impaired claim entitled to vote because the Plan strips all of the Secured Lender's rights without certainty of full payment of its claim.  The Trustee has no comfort in whether the Exit Facility can cover the full amount of the Secured Lender's claim (including post-petition amounts that continue to accrue and will be owing pursuant to the Loan Agreements and section 506 of the Bankruptcy Code).  The Trustee has no certainty about whether the Exit Facility will close (evidenced by the Debtors' recent inclusion of a sale alternative and lack of any update on the Exit Facility terms since mid-February).  The Trustee has no assurance that the sale alternative (on which no details have been provided) would result in sufficient proceeds to pay the Secured Lender's claim in full.

4.      The improper classification of DIP claims and improper treatment of Class 3 claims each independently warrant denying confirmation of the Plan, but collectively also require denying confirmation.  Courts consistently reject such attempts to manufacture an impaired consenting class and find that such plans fail to satisfy (i) the good faith requirement under section 1129(a)(3), or (ii) the impaired consenting class requirement under section 1129(a)(10).  Accordingly, this Court should reject the Debtors' attempt at manufacturing an impaired consenting class and deny confirmation of the Plan.

5.      In the alternative, if the Court finds that Class 2 is a valid impaired consenting class and Class 3 is an impaired dissenting class, confirmation of the Plan must be denied because Class 3 was not solicited, and also because the Plan fails to – and cannot – demonstrate that the cramdown requirements under section 1129(b) are satisfied.

6.      Finally, the Plan and Disclosure Statement have additional defects that separately

warrant denial of confirmation and the Disclosure Statement.  First, the proposed injunction in

section 10.02 of the Plan could prematurely enjoin and discharge claims against the Debtors, as it

purports to take effect from and after the Confirmation Date – even though creditors' claims will

not be paid until the Effective Date – and it is not clear if it would prevent claimants from protecting

their rights against the Debtors post-confirmation.  Second, section 5.09(e) of the Plan may

preclude the accrual of interest on Disputed Claims, even though some claims – such as the

Secured Lender's claim – are entitled to post-petition interest subject to the terms of section 506

of the Bankruptcy Code.  Third, the Plan and Disclosure Statement fail to provide adequate

information about how an alternative sale process would proceed.  This deficiency, coupled with

lack of clarity about the ability of the Debtors to pay the Secured Lender and other claimants in

full, cripples the Disclosure Statement, and renders it lacking in sufficient data needed to provide

creditors with adequate information to make an informed judgment about the Plan.

7.      For the foregoing reasons, the Disclosure Statement must be denied and

confirmation of the Plan must be denied.

## BACKGROUND

**I.      The Claim and Amounts Due Pursuant to Section 506(b) under the Loan and Notes**

8.      On November 2, 2018, the Trustee timely filed its proof of claim on behalf of the

Secured Lender, which was designated as Claim No. 14 in the chapter 11 case of the Debtor 1141

Realty Owner LLC (the "**Proof of Claim**").[3]  The Proof of Claim asserts a secured prepetition

claim in the amount of not less than $32,048,285.29 for amounts due under the Loan Documents

as of the Petition Date (as hereinafter defined).  Proof of Claim ¶ 18.  To the extent permitted by

---

[3] The Proof of Claim was subsequently filed on the docket on March 8, 2019 [Docket No. 129].

section 506 of the Bankruptcy Code, the Secured Lender is also entitled to recovery of other sums, including, but not limited to, interest, default interest, late fees, attorneys' fees, costs, and charges, that continue to accrue post-petition. As of February 28, 2019, the total amount due and owing under the Loan Documents was approximately $34 million and post-petition amounts continue to accrue under section 506(c). The Special Servicer has provided pay-off statements to the Debtors for amounts owed as of the Petition Date and as of February 28, 2019.

9.      The amounts are owed (the "**Secured Claim**") to the Secured Lender pursuant to a secured loan evidenced by, among other things, (i) a Loan Agreement, dated as of April 16, 2015 (the **"Loan Agreement"**), by and between Owner and to Rialto Mortgage Finance, LLC ("**Original Lender**"), (ii) a Consolidated, Amended and Restated Promissory Note A in the amount of $22,500,000 dated April 16, 2015 ("**Note A**") and Promissory Note B in the amount of $2,500,000 dated April 16, 2015 ("**Note B**" and together with Note A, the "**Notes**") made by Owner to the Original Lender, (iii) a Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Fixture Filing and Security Agreement dated as of April 16, 2015 (the "**Mortgage**") and (iv) all collateral and other documents, agreements and amendments referred to in, consolidated with, modified by or ancillary to the foregoing documents (all of the foregoing, and all documents identified above, collectively, the "**Loan Documents**").

10.     On September 15, 2017, the Special Servicer sent a Notice of Default and Acceleration (the "**First Notice**") to Owner, notifying Owner that it was "in default of its obligations under the Loan Documents in that, among other things, [Owner] ha[d] failed to maintain valid and effective liquor licenses issued by the New York Liquor Authority permitting [Owner] to serve alcoholic beverages at the Property." *See* Proof of Claim, Exhibit H.

11.     On October 11, 2017, the Special Servicer sent a Notice of Additional Defaults (collectively, with the First Notice, the "**Default Notices**") to Owner, notifying Owner that it was in further default under the Loan Documents for a number of additional defaults set forth therein. *See* Proof of Claim, Exhibit H.

12.     On September 18, 2017, the Secured Lender commenced foreclosure proceedings (the "**Foreclosure Action**") in the United States District Court for the Southern District of New York (the "**District Court**"), Case No.: 17-cv-7081-LGS-HBP, and among other things, sought appointment of a receiver.  In its complaint in the Foreclosure Action, the Trustee described that it had discovered Owner had been in default under the Loan Documents and had been operating the property in violation of New York state law shortly after the Loan closed in April 2015.  In particular, Owner had improperly replaced the company responsible for managing the Property (the "**Original Manager**") in or about August or September 2015, failed to maintain an appropriate license permitting it to serve alcohol at the Property (which had been held by the Original Manager), misappropriated funds that should have been placed in an account controlled by the Trustee, and failed to pay vendors and tax authorities (including on invoices as far back as 2015).  *See* Verified Complaint at paras 21-30, *Wilmington Trust, N.A. v. 1141 Realty Owner LLC*, 17-cv-7081 (S.D.N.Y.), ECF No. 1; Verified Complaint, Ex. R.

13.     On November 13, 2017, the Secured Lender and Owner "entered into an agreement designed to protect their mutual interests in the Flatiron Loan . . . during the pendency of litigation," which was so-ordered by District Judge Schofield on November 15, 2017 (the "**Stipulation and Order**").  *See* Contempt Findings at 7 (as defined below).  In the course of the District Court proceedings, Magistrate Judge Henry B. Pitman issued his Certification of Facts,

Conclusions of Law and Proposed Remedies (the "**Contempt Findings**"), finding that Owner was in contempt of numerous provisions of the Stipulation and Order.[4]

## II.    Relevant Events in the Chapter 11 Cases

14.    On July 31, 2018 (the "**Petition Date**"), the Debtors commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").  On September 21, 2018, the Court entered a final order authorizing an affiliate of Premier Flatiron LLC (together with its affiliates, "**Premier**") to provide junior debtor-in-possession financing, and authorizing the use of the Secured Lender's cash collateral and providing adequate protection therefor [Docket No. 62] (the "**DIP/Cash Collateral Order**").  The DIP/Cash Collateral Order provides numerous protections for the Secured Lender, including, among other things, (i) monthly adequate protection payments, (ii) weekly budget-to-actual reporting, (iii) replacement liens and superpriority claims as set forth therein and (iv) ensuring use of cash collateral was conditioned on, among other things, use in accordance with the budget.

15.    On February 22, 2019, the Debtors filed the solicitation version of the Plan and Disclosure Statement.  The Plan did not classify administrative expenses and priority tax claims (other than the DIP financing claims), consistent with section 1123(a)(1) of the Bankruptcy Code, but did classify the DIP financing claims as impaired Class 2 claims.  Class 2 claims would be satisfied and not receive a distribution if the Exit Facility closes on or before May 15, 2019, or if Premier otherwise contributes sufficient funds to pay Class 3 claims in full.  Class 2 claims would be paid in full, from sale proceeds, if the Debtors sell their real property.  *See* Plan § 3.05.  The

---

[4] Magistrate Judge Pitman applied the civil contempt standard, finding that with respect to certain of the clear and unambiguous terms of the Stipulation and Order, Owner clearly and convincing failed to comply with those provisions and did not diligently attempt to comply with those provisions in a reasonable manner. *See* Contempt Findings at 47–56.

Plan classified the Secured Claim as unimpaired Class 3 claims, which, upon and to the extent of allowance, will be either (i) paid in full on the Effective Date from proceeds of the Exit Facility if that facility closes on or before May 15, 2019 or (ii) paid from proceeds of a sale of the property or from additional funds provided by Premier.  *See* Plan § 3.06.  All other claims will be paid in full.  *See* Plan §§ 3.04, 3.07, 3.08.  Class 6 interests – equity holders of the Debtors – will be cancelled, but reorganized membership interests in Owner will be reissued to the existing equity-holder (50%) and Premier Nomad LLC (50%), and reorganized membership interests in Flatironhotel Operations LLC to Premier Nomad LLC (100%) (unless there is a sale, in which case equity will revert to how it was as of the Petition Date).  *See* Plan § 3.09.

## OBJECTION

### I.    The Plan Is Unconfirmable Under the Standards of 11 U.S.C. § 1129

16.    To confirm the Plan, the Court must find that the Debtors have satisfied the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018); *In re Quigley Co., Inc.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010).  The Debtors' proposed Plan fails to satisfy several key requirements for confirming a plan of reorganization under the Bankruptcy Code,[5] and the Secured Lender respectfully requests that this Court deny confirmation of the Plan on these grounds.  The Trustee further reserves the right to join in any other objection to the Disclosure

---

[5] In order to minimize accumulation of post-petition costs and expenses that may be borne by the estates pursuant to section 506, the Trustee sets forth its primary issues with the Plan and Disclosure Statement herein (each of which should be sufficient to warrant denial of confirmation of the Plan), but notes that the Plan may have additional issues with respect to sections 1129(a)(7), 1129(a)(11), and 1129(b), and with respect to solicitation and disclosure matters, and reserves its right to raise additional objections based on additional information that comes to light regarding the Plan and Disclosure Statement, or to the extent the Plan and Disclosure Statement are amended to address their infirmities, including any issues under sections 1129(a) or 1129(b) of the Bankruptcy Code.

Statement and Plan, and reserves the right to present arguments in support of the objections set forth therein.

### A. The Plan Manufactures an Impaired Consenting Class and Has Not Been Proposed in Good Faith (11 U.S.C. § 1129(a)(3))

17.    The Plan is unconfirmable because it manufactures an impaired consenting class in violation of numerous requirements for confirmation, evidencing an effort by the Debtors to obtain confirmation of the Plan over the objections of the Secured Lender.

18.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan have "been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3); *see also In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 174 (2d Cir. 2008) ("Under § 1129(a)(3), a plan will be found in good faith if it 'was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected.'") (quoting *In re Koelbl*, 751 F.2d 137, 139 (2d Cir.1984)); *accord In re LightSquared, Inc.*, 534 B.R. 522, 537-38 (S.D.N.Y. 2015).

19.    Courts have held that debtors seeking to manufacture an impaired consenting class, such as through artificial impairment or gerrymandering an impaired consenting class, violate the good faith requirement of section 1129(a)(3) of the Bankruptcy Code.  *See Vill. Green I, GP v. Fed. Nat. Mort. Ass. (In re Vill. Green I, GP),* 811 F.3d 816, 819 (6th Cir. 2016) (finding that artificially created class failed the good faith requirement for plan confirmation); *Windsor on the River Assoc. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs. Ltd.)*, 7 F.3d 127, 130 (8th Cir. 1993) ("To allow manipulation of claims in a reorganization proceeding under Chapter 11 would be contrary to the purpose of the provisions of the bankruptcy code."); *In re Daly*, 167 B.R. 734, 737 (Bankr. D. Mass. 1994) (finding that a debtor cannot manufacture an impaired class for the sole purpose of satisfying section 1129(a)(10) and thereby forcing the plan

upon a truly impaired class); s*ee also In re Quigley Co., Inc.*, 437 B.R. 102, 125-26 (Bankr. S.D.N.Y. 2010) (denying confirmation of plan for bad faith where debtor's parent manipulated the voting process to assure confirmation); *In re Local Union 722 Intern. Broth. of Teamsters*, 414 B.R. 443, 452-53 (Bankr N.D. Ill. 2009) (dismissing chapter 11 case where debtor could not propose a confirmable plan without improperly gerrymandering classes); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D.N.J. 2000) ("Of course, the classification and treatment of classes of claims is always subject to the good faith requirements under § 1129(a)(3).").

20.      Here, the Debtors have proposed a Plan that not only manufactures an impaired consenting class to force the Plan upon the Secured Lender, but does so in a manner that plainly contravenes the provisions of the Bankruptcy Code, as described in more detail in the following sections.  First, the so-called impaired class of Premier claims (Class 2) is not a permissible class of claims at all.  Instead, they constitute administrative expense DIP financing claims that section 1123(a)(1) *expressly* prohibits from being designated as a class.  Second, the Plan improperly categorizes the Secured Lender's Class 3 claims as "unimpaired" in violation of section 1124(1), even though the proposed treatment alters the Secured Lender's rights and does not ensure full payment in exchange for its claims.

21.      The counsel for the Trustee had previously voiced these, and other, concerns to counsel for the Debtors based on an earlier draft of the Plan, but none of these infirmities have been satisfactorily corrected.  The Debtors have opted to retain this structure, perhaps knowing that they needed to manufacture an impaired consenting class of claims to avoid having to address the fatal lack of clarity and certainty regarding the full satisfaction of Class 3 claims.  Indeed, the Trustee strenuously objects to this Plan given the significant uncertainty associated with the Exit

Facility and the absence of any clarity regarding the sale alternative or "additional" Premier funds. In failing to address these defects, the Debtors are plainly seeking to slip past the basic tenets and requirements of the Bankruptcy Code to avoid being held accountable for as long as possible. Such efforts cannot be countenanced, and violates the requirement under section 1129(a)(3) of the Bankruptcy Code that the Plan must be proposed in good faith.

**B.    The Plan Improperly Classifies the DIP Financing "Premier Claim" as Class 2 Claims (11 U.S.C. §§ 1129(a)(1), 1129(a)(2), 1123(a)(1), 1126(a), 1129(a)(9)(A))**

22.    Section 1129(a)(1) requires a plan to comply with the applicable provisions of chapter 11. *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986). These provisions include, without limitation, sections 1123 and 1124 of the Bankruptcy Code. *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re Johns-Manville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988) ("the legislative history of subsection 1129(a)(1) suggests that Congress intended the phrase 'applicable provisions' in this subsection to mean provisions of chapter 11 that concern the form and the content of reorganization plans …"); *In re Texaco, Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988) ("In determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to classification of claims and the contents of a plan of reorganization."). Moreover, section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a chapter 11 plan "comply with the applicable provisions of [chapter 11]." Section 1129's legislative history explains this provision as incorporating the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code. *See* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912.

23.    By classifying the administrative expense DIP financing claims as a class of claims, the Plan plainly violates sections 1123(a)(1), 1126(a) and 1129(a)(9)(A). *See* Plan § 3.05. Section

1123(a)(1) requires priority administrative expense claims, among certain other priority claims, to be treated differently – they cannot be designated as a class of claims. *See* 11 U.S.C. § 1123(a)(1) (stating that a plan shall "designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3) or 507(a)(8) of this title…"); *In re Sullivan*, 26 B.R. 677, 678 (Bankr. W.D.N.Y. 1982) (finding that section 1123(a)(1) prohibits classification of priority administrative expense claims, unsecured tax claims and others in a plan); *In re Daly*, 167 B.R. 734, 735 n.3 (Bankr. D.Mass. 1994) (finding that priority tax claimants which receive preferential treatment under section 1129(a)(9)(C) – like administrative expense claimants under section 1129(a)(9)(A) – are not an impaired class that can accept a plan and bind other truly impaired creditors to a cramdown).

24.     Indeed, the treatment of administrative expense claimants is specifically provided for under section 1129(a)(9)(A), and must be paid pursuant to the terms thereof, unless the claimant has otherwise agreed to different treatment. 11 U.S.C. § 1129(a)(9)(A). Additionally, section 1126(a) specifically authorizes only claims under section 502 to vote on a chapter 11 plan and does not reference administrative expense claims provided for under section 503. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 582 F.3d 422, 432 (2d Cir. 2009) (holding that administrative expenses under section 503(b) are not "claims" provided for under section 502).

25.     It is therefore axiomatic that post-petition DIP financing claims are not subject to cramdown and other requirements affecting classes of claims because they are treated as unclassified priority expense claims alongside other administrative expense claims and certain priority tax claims. *In re LightSquared Inc.*, 513 B.R. 56, 64 fn. 10 (Bankr. S.D.N.Y. 2014) (noting that "[i]n accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, [DIP Claims], U.S. Trustee Fees, and Priority Tax Claims are not classified in the Plan."); *In re*

*Tree of Life Church*, 522 B.R. 849, 859 (Bankr. D.S.C. 2015) ("a debtor's discretion is expressly limited by the statutory exclusion from designation as part of a "class" for voting purposes of claims of the types specified in §§ 507(a)(2)"); *In re Sullivan*, 26 B.R. 677, 678 (Bankr. W.D.N.Y. 1982) (finding section 1123(a)(1) a mandatory prohibition on classification of claims specified in 507(a)(2)); *In re Boston Post Road Ltd. P'ship*, 21 F.3d 477, 484 (2d. Cir. 1994) ("administrative claims are defines as priority claims...[and] their holders are not entitled to vote on a plan of reorganization."); *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1281 (5th Cir. 1991), on reh'g (Feb. 27, 1992) (noting that the holder of a post-petition administrative claim "is not entitled to vote on a plan of reorganization"); *In re Distrigas Corp.*, 66 B.R. 382, 385–86 (Bankr. D. Mass. 1986) (Noting that "[w]hile classes may be affected by the plan, priority claims must be paid in full and, therefore, cannot be impaired by the plan," and that "Congress never intended administrative claims to vote on the plan and illustrated that intent by specifically excluding administrative claims as constituting a class."); *see also* 7 Collier on Bankruptcy ¶ 1129.02[9][a], at 1129-43 (stating that section 1129(a)(9)(A) "constitutes the only essential confirmation requirement" for administrative claims since "[s]ection 1123(a)(1) . . . does not even allow such claims to be classified in the plan . . ."); OFFICIAL FORM 425B, *Disclosure Statement for Small Business Under Chapter 11,* https://www.uscourts.gov/sites/default/files/b_425b_1217_0.pdf (stating that "[Administrative expenses, involuntary gap claims, quarterly and Court Fees, and priority tax claims] are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan.").

26.    In contravention of these requirements, the Plan designates administrative expense claims owed to Premier pursuant to the DIP/Cash Collateral Order as impaired Class 2 claims. *See* DIP/Cash Collateral Order ¶ 7 (granting allowed super priority administrative claims to the DIP

Lender).  The Plan's designation of DIP financing claims as Class 2 claims contravenes the basic requirements for confirmation of a plan under sections 1123(a)(1), 1129(a)(1) and 1129(a)(9) of the Bankruptcy Code, and violates the requirements for soliciting the vote of administrative expense claims that are not entitled to classification or a vote pursuant to sections 1126(a) and 1129(a)(2) of the Bankruptcy Code.  Accordingly, the confirmation of the Plan should be denied on this basis alone – and the grounds for denial are even stronger when coupled with the other infirmities set forth herein.

### C. The Plan Improperly Describes the Secured Lender's Class 3 Claims as Unimpaired (11 U.S.C. §§ 1129(a)(1), 1129(a)(2), 1124(1), 1126)

27.    As described above, section 1129(a)(1) requires a plan to comply with the applicable provisions of chapter 11, including section 1124 of the Bankruptcy Code, and section 1129(a)(2) requires the proponent to comply with the applicable provisions of chapter 11, including the solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.  *See, e.g.*, *In re Valley Park Grp., Inc.*, 96 B.R. 16, 22 (Bankr. N.D.N.Y. 1989) (finding that failure to comply with section 1124 is "in contravention of Code § 1129(a)(1).").

28.    The Plan violates section 1124(1) of the Bankruptcy Code by improperly classifying Class 3 claims as unimpaired, when they are in fact impaired.  *See* Plan § 3.06.  Under section 1124(1) of the Bankruptcy Code, class of claims is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim" under section 1124(1).  *Any* alteration of these rights constitutes impairment, including a failure to pay post-petition amounts, forced sale of a secured creditor's collateral, or a delay in payment beyond a contractual maturity date.  *See generally In re GSC, Inc.*, 453 B.R. 132, 177 (Bankr. S.D.N.Y. 2011) (holding that a claim is impaired if there is "any alteration to a claim, including one that *benefits* the party," as well as an alteration that forces a secured creditor to sell

its collateral and prevent it from exercising its prepetition contractual rights); *In re Coram Healthcare Corp.*, 315 B.R. 321, 344 (Bankr. D. Del. 2004) (holding that "section 1124 contemplates creditors may be paid [post-petition] interest when they are treated as unimpaired under a plan of reorganization"); *In re G.L. Bryan Investments, Inc.*, 340 B.R. 386 (Bankr. D. Colo. 2006) (creditors' claims considered impaired because chapter 11 plan altered their legal rights by deferring payment of claims and reducing interest rate); *In re Brewery Park Assocs., L.P.*, 2011 Bankr. LEXIS 1596, at *26 (Bankr. E.D. Pa. Apr. 29, 2011) (creditors' claims impaired because, among other things, chapter 11 plan deferred any plan distribution for at least six months); *In re Downtown Athletic Club of New York City, Inc.,* No. 98 B 41419 JLG, 1998 WL 898226, at *6 (Bankr. S.D.N.Y. Dec. 21, 1998) (finding that section 1124 "defines impairment in the broadest possible terms"); *In re American Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988) ("even the smallest impairment . . . entitles a creditor to participate in voting."); *In re Canal Asphalt, Inc.*, No. 15-23094 (RDD), 2017 WL 1956849, at *7 (Bankr. S.D.N.Y. May 10, 2017) (finding that section 506(b) allows for post-petition legal fees provided that the claim is oversecured and the fees are reasonable and contractual).

29.     Here, the Plan asserts that Class 3 claims will be paid in full on the Effective Date, but the Plan does not actually provide any assurance that such claims ***can*** be paid in full – including post-petition amounts that are accruing and payable pursuant to the Loan Agreements and section 506 of the Bankruptcy Code.

30.     Even if the Exit Facility does ultimately close, the Plan offers no clue as to the terms contained therein.  Indeed, even though the Debtors have expressed an intention of closing the Exit Facility by May 15, 2019, the Trustee has received no update since its initial terms were disclosed two months ago, despite asking for an update on several occasions.  As such, the Trustee has no

assurance that the Exit Facility would be sufficient to pay in full the Class 3 claims (including any post-petition amounts thereunder). And there is no information about how any shortfall for the Class 3 claim would be funded. *See* Plan § 3.06 (stating that the Class 3 claims would only receive payment from the Exit Facility if it closes).

31.    If the Exit Facility does not close, the Plan does not explain how Premier would be able to provide "additional Premier Funds" to satisfy Class 3 claims in full, thus leaving a sale of the real property as the Trustee's only true, contractual alternative means of recovery. However, notwithstanding the appraisal of the real property, the Debtors have not established any procedures or milestones for such a sale (or evidenced any liquidity to run such a sale process),[6] have not performed any marketing, have not received any bids on the property, and thus cannot provide any assurance that the Secured Lender will recover in full in the event of a sale. *See, e.g.*, *In re Arnold & Baker Farms*, 85 F.3d 1415, 1421 (9th Cir. 1996) ("Experience has taught us that determining the value of real property at any given time is not an exact science. Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold."); *see also In re GSC, Inc.*, 453 B.R. 132, 177 (Bankr. S.D.N.Y. 2011) (finding that a forced sale of collateral would constitute impairment of a secured claim under section 1124(1) regardless of the outcome of the sale, as such action impairs the secured creditor's contractual rights.)

32.    Thus, the Plan's treatment of Class 3 claims as "unimpaired" is contrary to the requirements set forth in section 1124. The discharge of Class 3 claimants' legal, equitable and contractual rights under the Plan in exchange for payment from either an uncertain, undocumented

---

[6] On March 18, 2019, counsel to the Trustee received a draft confirmation order that contained a very preliminary set of sale procedures. The Trustee notes that any sale process must provide for the Secured Lender's axiomatic right to credit bid its *impaired* claim pursuant to sections 363(k) and 1129(b)(2)(A) of the Bankruptcy Code. *See RadLAX Gateway Hotel LLC v. Amalgamated Bank*, 132 S. Ct. 2065 (2012).

Exit Facility, unspecified "additional" Premier funds, or a forced sale offers no guarantee of full payment, and demonstrates that Class 3 claimants are impaired.

33.     However, since the Plan described Class 3 claims as unimpaired, the Class 3 claims were denied their rights to vote on the Plan, in violation of sections 1126 and 1129(a)(2) of the Bankruptcy Code.  Coupled with the improper designation of DIP financing claims as "Class 2 claims," the incorrect treatment of Class 3 claims resulted in an improper solicitation of the Plan, and would require, at a minimum, the Plan as drafted be denied and re-solicited based on an accurate classification and treatment of claims.

### D.  The Plan Does Not Comply with 11 U.S.C. § 1129(a)(10) Because There is No Impaired Consenting Class of Claims

34.     As described above, the Plan includes an invalid "impaired" class of claims (Class 2) and a class of claims improperly treated as unimpaired (Class 3), potentially in an effort to manufacture an impaired consenting class to satisfy section 1129(a)(10) of the Bankruptcy Code, which requires that at least one impaired class of claims accept the plan.

35.     Section 1129(a)(10) of the Bankruptcy Code requires at least one class of impaired creditors to have accepted the proposed Plan.  *See* 11 U.S.C. § 1129(a)(10).  The Bankruptcy Code does not permit the cramdown of a plan that is not accepted by even one impaired class.  *In re RYYZ, LLC*, 490 B.R. 29, 39 (Bankr. E.D.N.Y. 2013).  Section 1129(a)(10) "ensures that prior to 'embarking upon the tortuous path of cramdown and compelling the target of cramdown to shoulder the risks of error necessarily associated with a forced confirmation,' there is a showing that some group hurt by the plan favors the plan."  *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995) (quoting *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1020 (Bankr. S.D.N.Y. 1993), *aff'd*, 1993 WL 316183 (S.D.N.Y. May 21, 1993)) ("There must be a manifestation of creditor support for the proposed plan before a court should even consider the

merits of the proposed plan."). Section 1129(a)(10) acts as a "statutory gatekeeper barring access to cram down where there is absent even one impaired class accepting the plan." *In re 266 Wash. Assocs.*, 141 B.R. 275, 287 (Bankr. E.D.N.Y.), *aff'd sub nom.*, *266 Wash. Assoc. v. Citibank, N.A. (In re Wash. Assocs.)*, 147 B.R. 827 (E.D.N.Y. 1992).

36.    For the reasons described above,[7] under the Plan, there is only one impaired class of claims – Class 3 claims consisting of the Secured Claim – and it does not accept the Plan. According, the Plan also violates section 1129(a)(10) of the Bankruptcy Code.

### E.  The Plan Violates Several Other Requirements for Confirmation Under Section 1129 of the Bankruptcy Code

37.    The Trustee also points out a number of additional defects with the Plan that warrant denial of confirmation:

- The proposed injunction as set forth in section 10.02 of the Plan is unclear and could prematurely enjoin and discharge claims against the Debtors, in violation of section 524(a) of the Bankruptcy Code. Specifically, the injunction purports to take effect "from and after the Confirmation Date" and would prevent the Secured Lender – and any other claimant – from defending its claims against the Debtors. Accordingly, the injunction should be clarified and amended to provide that (i) it does not take effect until the Effective Date and (ii) provide clear carve-outs for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order.

- Section 5.09(e) of the Plan is ambiguous, and should be amended. While on the one hand, it states that post-petition interest on the Secured Claim will continue to accrue, it later states that interest shall not accrue or be paid on any Disputed Claim even if it becomes allowed. The Plan must be amended to clarify that the statement regarding interest on Disputed Claims shall not apply to the Secured Claim.

---

[7] The Trustee has assumed that arguments related to the manufacture or "gerrymandering" of an impaired class for purposes of satisfying section 1129(a)(10) are applicable for determining the whether the Plan has been proposed in "good faith" under section 1129(a)(3). To the extent such arguments are applicable under section 1129(a)(10) instead, the Trustee incorporates all of those arguments herein. *See, e.g.*, *Epic Metals Corp. v. Condec, Inc.*, 232 B.R. 806, 809-10 (M.D. Fla. 1999) (finding a violation of section 1129(a)(10) where class of creditors was artificially impaired to overcome opposition of truly impaired creditors) ; *In re Lettick Typografic, Inc.*, 103 B.R. 32, 39 (Bankr. D. Conn. 1989) (denying confirmation of plan where class was artificially impaired because allowing such literal compliance with section 1129(a)(10) would reduce it to a nullity).

### F.  The Plan Cannot Satisfy the Cramdown Requirements

38.    As discussed above, the Plan does not have an impaired consenting class, and thus there is no need to address issues relating to the cramdown requirements under section 1129(b) of the Bankruptcy Code.  However, in the event the Court finds that there is an impaired consenting class and that Class 3 is an impaired, dissenting class, the Plan further cannot satisfy the fair and equitable test with respect to the Class 3 claimants.[8]

39.    Section 1129(b) of the Bankruptcy Code permits confirmation of a plan over the objection of a class of creditors that votes against the plan but only if the plan does not discriminate unfairly among creditors and "is fair and equitable . . . with respect to each class of claims . . . that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).  A plan is fair and equitable with respect to a class of secured claims if it satisfies one of the three alternatives set forth in section 1129(b)(2)(A).  *See In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014).  First, the Plan does not purport to preserve any of the Secured Lender's liens, thus rendering section 1129(b)(2)(A)(i) inapplicable.

40.    Second, the Plan does not provide Class 3 claims with the "indubitable equivalent" of their claims under section 1129(b)(2)(A)(iii).  As the court described in *LightSquared*, an "indubitable equivalent" generally exists when "a plan both protects the creditor's principal and provides for the present value of the creditor's claim . . . [and]  courts focus on the value of the collateral relative to the secured claim, and the proposed interest rate of the facility providing the indubitable equivalent."  *LightSquared*, 513 B.R. 56, 93 (citing *In DBSD*, 419 B.R. at 207).  "Courts have held that the 'indubitable equivalent' standard requires that there be no doubt that

---

[8] In order to minimize accumulation of post-petition costs and expenses that may be borne by the estates pursuant to the Loan Documents and section 506, the Trustee outlines this alternative argument on cramdown in brief, and reserves the right to further develop these arguments in the event findings are made to require an analysis of section 1129(b) of the Bankruptcy Code.

replacement recoveries are equal to existing security interests." *Id.* (citing (*In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 310 (3d Cir. 2010)).

41.     The indubitable equivalence test generally comes into play where a plan of reorganization purports to satisfy a secured creditor's claim by providing a transfer of collateral or other non-cash property to the creditor.  Here, the Plan does not seek to transfer any such property to the Secured Lender, and instead purports to pay the Secured Lender in full in cash.  But as described in detail above, the Plan does not provide any assurance that the Debtors can pay the Secured Lender in full.  Since the Plan offers no protection or certainty as to the full recovery of the Secured Claim, the Plan's proposed treatment of the Secured Claim cannot constitute "indubitable equivalent" of the Secured Claim.  *See, e.g.*, *In re Arnold & Baker Farms*, 85 F.3d 1415, 1421 (9th Cir. 1996) ("'Indubitable' means 'too evident to be doubted'"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 915-16 (Bankr. W.D Okla. 196) ("Something is dubitable if it is open to doubt or question and, conversely, is indubitable if it is not open to any doubt.").

42.     Finally, the Plan's glaring omission of any substantive sales procedures for the sale alternative fails to satisfy the requirements of section 1129(b)(2)(A)(ii) of the Bankruptcy Code.  The Plan offers no details regarding the sale alternative.  The Plan fails to disclose a liquidity source for the sale, a marketing or broker agent for the sale, or detailed sale procedures and milestones.  Most critically, the Plan fails to specify that the Secured Lender reserves its right to credit bid pursuant to section 363(k) of the Bankruptcy Code.  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065 (2012). For the Plan to satisfy section 363(k) and section 1129(b)(2)(A)(ii) of the Bankruptcy Code, the Debtor must disclose actual and detailed sale procedures.

## II.    The Disclosure Statement Lacks Adequate Information

43.    A disclosure statement is the primary source of information upon which a debtor's creditors and other stakeholders rely in making an informed judgment about a plan of reorganization. Given this reliance, "the debtor's obligation to provide sufficient data to satisfy the Code's standard for 'adequate information'" cannot be overemphasized.[9]  *Kunica v. St. Jean Fin. Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid [*sic*] by the reliance placed upon the disclosure statement by the creditors and the court.")); *see also 680 Fifth Ave. Assocs. v. EGI Co. Servs. Inc. (In re 680 Fifth Ave. Assocs.)*, 209 B.R. 314, 321 n.8 (Bankr. S.D.N.Y. 1997) (same).

44.    Whether a disclosure statement contains adequate information to enable creditors to make such a decision is a "fact-specific inquiry into the particular plan" in question.  *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (S.D.N.Y. 1995).  A disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives so that they can intelligently accept or reject the Plan."  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988); *see also In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (a disclosure statement must "clearly and succinctly inform the average . . . creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution").  Courts therefore will decline to approve disclosure statements that either fail to provide basic financial information about the

---

[9] Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, . . . that would enable [] a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

debtor, *see In re Source Enterprises, Inc.*, No. 06-11707, 2007 WL 7144778, at \*3 (Bankr. S.D.N.Y. July 31, 2007) ("A creditor is entitled, prior to voting on a plan, to information about a debtor's financial status."), or that otherwise lack sufficient information to enable a creditor to make an informed decision regarding whether to accept or reject the plan. *See In re E. Redley Corp.*, 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982) ("Without information sufficient to allow parties voting on the plan the opportunity to arrive at an independent and informed judgment, the disclosure statement cannot be approved.").

45.    Counsel for the Trustee and counsel for the Debtors have had some communications regarding the contents of the Disclosure Statement and the adequacy of the information contained therein.    These conversations are ongoing, and the Trustee intends to continue working with the Debtors to ensure the Disclosure Statement contains adequate information on which creditors may make an informed decision regarding the Debtors' proposed Plan.  The Trustee is most concerned with the following items:

- The treatment of Class 3 Claims is not clear and the Debtors provide inadequate information about how payment will occur.  There is no assurance or information regarding the Exit Facility (which may need to close as early as May 15), making it impossible for the Trustee to determine whether such funding is actually available to pay the claims in full.

- There is no information regarding the means by which the Debtors will undertake the sale process, nor about how Premier would provide the "additional" Premier Funds mentioned on pages 15 and 17 of the Disclosure Statement – which is especially critical because this situation arises if Premier is unable to raise Exit Facility – casting doubt as to Premier's ability to raise funds to support a sale process or provide additional funds.  This also invites serious concerns about Premier's ability to fund the other obligations under the Plan (e.g. payment of the general unsecured claims and priority claims) – the details of which have not been provided.

- On page 15 of the Disclosure Statement, it states that the sale/additional Premier Funds option kicks in if the Exit Facility does not close on or before May 15, 2019, while on page 17, it says the option kicks in if the Exit Facility does not close within 90 days of the Confirmation Date.  This same ambiguity is on pages 8 and 9 of the Plan.

46.     The Trustee believes the Debtors must include enhanced disclosure on these topics and thus, as it currently stands, the Disclosure Statement does not contain information sufficient to enable a creditor to determine how to vote on the Plan.  The Trustee will continue to engage with the Debtors in an attempt to resolve these outstanding concerns.  However, in the event the Debtors do not make appropriate modifications to address the inadequacies discussed above prior to the hearing, the Court should not approve the Disclosure Statement. *See In re Source Enterprises, Inc.*, 2007 WL 7144778 at *3-4 (declining to approve the debtor's disclosure statement that "did not provide adequate information upon which a hypothetical investor could make an informed judgment about the Plan").

## RESERVATION OF RIGHTS

47.     The Trustee expressly reserves all rights to supplement and amend this Objection based on any new facts that come to light (including without limitation with respect to the Disclosure Statement, Plan, adequacy of solicitation and its rights with respect to the foregoing, including under sections 1129 of the Bankruptcy Code), to seek an adjournment of the hearing on the Disclosure Statement and Plan and to introduce evidence at any hearing relating to this Objection.  The Trustee further reserves all rights to object to the Plan, Disclosure Statement and any such amended Plan or Disclosure Statement (including without limitation its right to credit bid in the event of any sale of the real property) to the extent the classification and treatment of claims under the Plan is amended to comply with the provisions of the Bankruptcy Code.  The Trustee further reserves the right to join in any other objection to the Disclosure Statement and Plan, and reserves the right to present arguments in support of the objections set forth therein.

48.     With respect to the Secured Claim, the Trustee reserves all rights to amend, supplement, revise, or otherwise respond to any further objections on any and all additional factual or legal grounds relevant to the Proof of Claim, and, without limiting the foregoing, to (i) amend

the Proof of Claim, (ii) file additional papers in support of the Secured Claim, and (iii) take any

and all other appropriate actions to respond to any further objection to the Secured Claim based on

any and all grounds.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Trustee and Secured Lender respectfully request that the Court denies approval of the Disclosure Statement, denies confirmation of the Plan, and grants such other relief as the Court deems just and proper under the circumstances.

Dated: April 11, 2019
       New York, New York

**SIDLEY AUSTIN LLP**

*/s/ Michael G. Burke*
Michael G. Burke
Dennis Kao
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Counsel for Wilmington Trust, N.A., solely in its capacity as Trustee*