UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                       :    Chapter 11

In re:                          :    Case No. 18-12341 (SMB)

                                    :

1141 REALTY OWNER, et al.,        :

                                    :

                        Debtors.    :    Jointly Administered

                                    :
-------------------------------------------------------------------x

## OBJECTION OF REORGANIZED DEBTOR, 1141 REALTY OWNER LLC, TO PRE-PETITION CLAIMS AND ADMINISTRATIVE CLAIMS OF TCG ACQUISITIONS 2 LLC

      1141 Realty Owner LLC, the Reorganized Debtor (hereinafter, "Debtor") in the above

captioned cases (the "Chapter 11 Cases"), hereby objects ("Objection") to claims asserted by

TCG Acquisitions 2 LLC ("TCG") as set forth in: (1) the Proof of Claim ("POC"), designated

Claim No. 14 on the Claims Register, in the amount of $32,048,285.29, filed on November 2,

2018 by Wilmington Trust, N.A. on behalf of the Prepetition Lenders,[1] and assigned to TCG on

April 18, 2019; (2) the Administrative Claim, designated Claim No. 17 on the Claims Register,

in the amount of $2,564,803.56, filed on June 14, 2019 by TCG; and (3) TCG's Claims in its

purported "Updated Payoff Amount" calculation transmitted to Debtor on April 25, 2019

(collectively, the "Claims"),[2] and respectfully states as follows:

### Preliminary Statement

      1.      TCG's Claims for default interest should be disallowed in their entirety because

the alleged loan default underlying the Claims never existed.  Wilmington Trust, N.A., as

---

[1]      On the Petition Date, Wells Fargo Bank (by the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-C28, Commercial Mortgage Pass-Through Certificates, Series 20 15-C28), owned the senior promissory note ("Note A"), and Delshah Capital, LLC, an entity related to TCG, owned the junior promissory note ("Note B"). The notes were jointly administered pursuant to an intercreditors' agreement.

[2]      Copies of the Claims are attached as Exs. A, B, and C to the accompanying Declaration of Alan D. Zuckerbrod, Esq.  All references to exhibits herein, as "Ex(s). __," are to the Zuckerbrod Declaration.

01101923.13

Trustee on behalf of the owners of the two promissory notes (Note A and Note B) comprising the mortgage loan, served a purported "Notice of Default/Notice of Acceleration" (the "Default and Acceleration Notice") on Debtor on September 15, 2017, and the next business day, on September 18, 2017, commenced a foreclosure action in the United States District Court, Southern District of New York, seeking to foreclose its mortgage on Debtor's Flatiron Hotel, a 62-room hotel located at 9 West 26th Street a/k/a 1141 Broadway, New York, New York (the "Hotel").

2.      The *sole* ground for Wilmington's Default and Acceleration Notice was its baseless contention that the Hotel's liquor licenses were no longer "in full force and effect," and constituted an "Event of Default," with no opportunity to cure, as defined under Section 7.1(xii) of Wilmington's loan agreement with Debtor (the "Loan Agreement"). In fact, there was no Event of Default.

3.      It is indisputable that the liquor licenses were valid, active, and in full force and effect on the date the Default and Acceleration Notice was served, and on the date the foreclosure action was commenced. The New York State Liquor Authority ("SLA") had not revoked, cancelled or suspended the liquor licenses before those dates. Nor had the SLA even alleged that there had been a violation. Debtor was in full compliance with the Loan Agreement, which, under Sections 4.1.12 (d)(xix) and 4.1.24, only required that the liquor licenses be maintained "in full force and effect." These defenses and related counterclaims were asserted by Debtor in the District Court foreclosure action, which never advanced beyond the pleading stage once the Chapter 11 petition was filed on July 18, 2018. The District Court recognized the tenuousness of Wilmington's claim when it denied Wilmington's motion for the appointment of a receiver.

2

4.       In the absence of an actual Event of Default, as defined by the Loan Agreement, Wilmington wrongfully accelerated the loan and commenced its foreclosure action, in breach of the Loan Agreement.  Therefore, TCG's Claims for pre-petition and post-petition default interest accruing on the principal amount of the loan, as well as related fees and expenses premised on the default, should be disallowed in their entirety, as a matter of law.

5.       TCG's other Claims for: (i) late fees, (ii) "financials" (fees based on the alleged failure by Debtor to provide financial statements), (iii) "special servicing fees," (iv) workout fees, (v) interest and default interest on tax advances, (vi) insurance advances, (vii) so-called "property protection advances," consisting solely of pre-petition attorneys' fees and expenses, plus interest and default interest, (viii) post-petition attorneys' fees, (ix) yield maintenance default premiums,[3] and (x) payoff processing fees, also should be disallowed to the extent and for the reasons set forth herein.

6.       Debtor further objects to the Claims asserted in TCG's purported "Updated Payoff Amount" calculation.  It violates this Court's Order, dated September 24, 2018, which sets a November 5, 2018 bar date for pre-petition claims (ECF Doc. No. 63), and impermissibly adds new Claims to the POC (*i.e.*, "Special Servicing Fees," "Insurance Advances," and interest and default interest on the alleged "Tax Advances" and attorneys' fees) that were not asserted in the POC filed by Wilmington.  TCG's "update" seeks to raise TCG's pre-petition Claim by approximately $2 million, and should be disallowed for the reasons set forth herein.

---

[3]       Pursuant to a Memorandum Decision and Order Granting Summary Judgment Regarding the Enforceability of Yield Maintenance Default Premium, dated and entered on March 18, 2019 [Docket No. 132], this Court denied an Objection filed by Debtor with regard to Yield Maintenance Default Premium, and determined that such claim is enforceable.  The Court did not determine the amount of the Claim, which Debtor disputes.

01101923.13

## Background Facts

7.    On Friday, September 15, 2017, Wilmington, on behalf of the Prepetition

Lenders, delivered a Default and Acceleration Notice to Owner pursuant to its Loan Agreement

with Debtor, alleging that "Borrower is in default of its obligations under the Loan Documents in

that, among other things, Borrower has failed to maintain valid and effective liquor licenses

issued by the New York Liquor Authority permitting Borrower to serve alcoholic beverages at

the Property." *See* Ex. D, Default and Acceleration Notice.  This was the *only* alleged default in

the notice and upon which the acceleration of the loan was predicated.

8.    The very next business day, on Monday, September 18, 2017, Wilmington

commenced a foreclosure action against Debtor in the United States District Court, Southern

District of New York, Case No.: 17-cv-7081-LGS-HBP.  In its complaint (the "Original

Complaint"),[4] Wilmington alleged only <u>one</u> basis for its default notice and acceleration of the

loan:  "Borrower's failure to maintain valid and effective liquor licenses issued by the SLA

permitting Borrower to serve alcoholic beverage at the Property constitutes an Event of Default

under the Loan Documents." *See* Ex. E, Original Complaint (without exhibits), at ¶ 31.

9.    Since the inception of the loan, and on the date the Default and Acceleration

Notice was delivered to Debtor, the subject three (3) liquor licenses (the "Liquor Licenses") were

held in the name of two entities – Toshi's Penthouse Inc., and 9 West 26th St. Rest., LLC (the

"Licensees") – which were controlled by Robert K. Y. Chan ("Chan") (then, a 10% owner of a

portion of the equity of Debtor 1141 Realty Owner) through his entity, You Gotta Have Faith

LLC, which was the "Original Manager" of the Hotel under the Loan Agreement. *See* Ex. F,

Loan Agreement, at § 1.1, defining "Liquor Licenses."

---

[4]    Wilmington filed an Amended Complaint on December 7, 2017.  *See* ¶¶ 19-21, *infra*.

01101923.13

10.     Debtor's obligations concerning its Liquor Licenses are set forth in the Loan Agreement and related loan documents.  In the Management Agreement, Debtor was required to keep the Liquor Licenses "*in full force and effect*."  *See* Ex. G, Management Agreement, at § 1.03(A)(11) [emphasis added].

11.     Section 4.1.24 of the Loan Agreement, entitled "Liquor Licenses," states:

> (a)     Borrower (i) shall cause Licensee and/or its successor and/or assigns to maintain the Liquor License(s) and shall cause each Liquor License to be continuously renewed at all times, and (ii) shall deliver or cause to be delivered to Lender copies of each updated Liquor License as and when issued.

> (b)     Notwithstanding the foregoing, upon proper written notice to Lender, Borrower shall be permitted to make application with the applicable Governmental Authorities to have the Liquor License transferred to Borrower or to an Affiliate of Borrower that is controlled by Key Principal.

*See* Ex. F, Loan Agreement § 4.1.24.

12.     Under Section 7.1(xii) of the Loan Agreement, one of the enumerated "Events of Default" is deemed to occur "if, without Lender's prior written consent, any required license, permit, including, without limitation, the Liquor License[s], relating to the Property *ceases to be in full force and effect*."  *See* Ex. F, Loan Agreement, at § 7.1(xii) [emphasis added].  There is no notice requirement or cure period for this Event of Default.

13.     In its Original Complaint, Wilmington acknowledged that the Licensees held the Liquor Licenses.  *See* Ex. E, Original Complaint, ¶ 25.  It further alleged, *upon information and belief*, that the Liquor Licenses were no longer valid because the Original Manager of the Hotel (You Gotta Have Faith Realty LLC), the Licensees, and Chan had no role in the management of the hotel after 2015.  *Id.* at ¶¶ 22, 25.  Based on these allegations, Wilmington conclusorily alleged that Debtor's service of alcoholic beverages was without a valid license and constituted

5

an Event of Default under the Loan Documents. *See id.*, at ¶ 26. It is noteworthy that there is no provision in the Loan Documents that requires the Hotel to sell liquor. Furthermore, the Hotel was never accused by the SLA or anyone else at that time of selling alcohol without a proper liquor license.

14.      On the same day it filed the Original Complaint, Wilmington moved, by order to show cause, for the appointment of a receiver, which motion Debtor opposed. However, for many months *prior* to delivering the Default and Acceleration Notice, Wilmington, through its loan servicer (Midland Loan Services), had pressured Debtor to consent to the appointment of a receiver, and even withheld Debtor's operating funds maintained at Wells Fargo Bank – *funds exclusively controlled by Wilmington, through its loan servicer* – in an effort to coerce Debtor to agree. *See* Point II(A), *infra*. *See* Ex. H, Declaration of Jagdish Vaswani ("Vaswani"),[5] dated October 19, 2017, and Exhibits E, F, and G annexed thereto ("Vaswani Dec."). When it became clear that Debtor would not agree, Wilmington noticed the bogus Event of Default and improperly accelerated the loan. *See id.* On the very next business day, Wilmington brought its foreclosure action and moved for the appointment of a receiver.

15.      On October 2, 2017, the District Court issued an Order denying the motion, finding, *inter alia*, that "[b]ecause the New York State Liquor Authority has not revoked the liquor license, which remains active and in Mr. Chan's control, the trustee [Wilmington] has not shown either that the borrower [Debtor] has defaulted on its obligation under the loan agreement or a probability of success on the merits." *See* Ex. J, Order, dated October 2, 2017, and Transcript of October 2, 2017 Hearing of Wilmington's motion for a receiver (collectively, "October 2, 2017 Order/Transcript") at p. 20. The District Court also opined that "[t]his dispute

---

[5]      At that time, Vaswani was the 90% owner of Debtor 1141 Realty Owner through his entity, Main Team Hotels LLC.

01101923.13

feels to me as though its prompted by the bank's desire not to continue with the loan or at least not continue with the loan on its current terms." *See Id.* at p. 6.

16.    On October 19, 2017, Debtor filed its Answer and Counterclaims ("Answer") in the District Court Action, whereby it denied substantially all of the material allegations in Wilmington's Original Complaint, and asserted affirmative defenses and counterclaims against Wilmington, including its assertion that Wilmington "materially breached the Loan Agreement, by among other things, serving an improper notice of default and accelerating the loan without any conduct or event constituting an Event of Default, and commencing this foreclosure action without any basis…." *See* Ex. K, Answer, at ¶ 52. Debtor's counterclaims sought monetary damages for Wilmington's breach of contract, breach of fiduciary duty, and breach of its duty of good faith and fair dealing, based on its wrongful acceleration of the loan.

17.    On November 7, 2017, Debtor amended its answer to add a counterclaim seeking damages based upon Wilmington's alleged negligent impairment of collateral. *See* Ex. L, Amended Answer with Affirmative Defenses and Counterclaims.

18.    On December 7, 2017, Wilmington amended its complaint to, *inter alia*: (i) add Vaswani, Chan, the City of New York, and the State of New York as party defendants, and (ii) add claims seeking money damages for alleged breaches of the notes and certain personal guaranties. *See* Ex. I, First Amended Verified Complaint (the "Amended Complaint") (without exhibits).

19.    Significantly, in its Amended Complaint, the alleged Liquor Licenses default remained the *sole* predicate "Event of Default" relied upon by Wilmington to accelerate the loan and commence its foreclosure action. *See* Ex. I, Amended Complaint, at ¶¶ 51, 54-55.

01101923.13

20.    In particular, Wilmington alleged that "Borrower's illegal service of alcoholic beverages at the Property "without a valid and effective license constituted an Event of Default (with no cure period) under the Loan Documents, is a violation of New York law, and *could lead to* a prohibition on the services of alcoholic beverage at the Property and the revocation of insurance coverage for the Property." *See* Ex. I, Amended Complaint, at § 51 [emphasis added]. Wilmington also alleged that the alleged lack of valid and effective Liquor Licenses renders the viability of the Property "to continue operating as a boutique, luxury hotel" "in significant doubt." *Id.* Such allegations were pure speculation. None of these doomsday scenarios had occurred and none were the basis for the acceleration.

21.    Although Wilmington's Amended Complaint referred to myriad other alleged acts of misconduct by Debtor, none of them were alleged to be the basis for its declaration of an "Event of Default" and acceleration of the loan. The alleged Liquor License default remained the sole basis. Moreover, none of the alleged other acts of misconduct, which provided 10- or 30-day cure periods, were asserted *before* Wilmington served its Default and Acceleration Notice, and accelerated the loan.

22.    On April 13, 2018, Wilmington moved to dismiss Debtor's counterclaims, which motion Debtor opposed. However, on June 12, 2018, before the motion and cross-motion to dismiss were decided, the District Court granted Debtor's counsel's motion to withdraw as counsel for Debtor and Vaswani, by Order dated June 18, 2018. *See* Ex. M, Order dated June 18, 2018.

23.    On July 27, 2018, Wilmington moved to dismiss Debtor's counterclaims for failure to prosecute, pursuant to Fed. R. Civ. P. 41, because Debtor had not been able to retain replacement counsel.

24.     On July 31, 2018 (the "Petition Date"), Debtor, 1141 Realty Owner LLC, as fee owner of the Flatiron Hotel, and Flatironhotel Operations LLC, the Hotel operator (collectively, "Debtors"), each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

25.     By Order dated August 17, 2018, the District Court dismissed Debtor's counterclaims for failure to prosecute on the grounds that Debtor had failed to retain replacement counsel or file any opposition to Wilmington's motion to dismiss Debtor's counterclaims. *See* Ex. N, Order dated August 17, 2018.

26.     Significantly, however, the District Court never reached a final adjudication on the merits of Wilmington's allegations:  (i) that an incurable Event of Default occurred under the Loan Agreement based on the Liquor Licenses, and (ii) the Liquor Licenses were no longer valid and effective when Wilmington delivered its Default and Acceleration Notice to the Debtor.

27.     On November 2, 2018, Wilmington filed the POC, designated Claim No. 14 on the Debtors' Claims Register, in the amount of $32,048,285.29.  *See* Ex. A, POC.

28.     On November 16, 2018, Debtors filed an Objection to the Claim (ECF Doc. No. 84) (the "First Objection") on two grounds:  (i) the Claimed Amount of "not less than" $32,048,285.29" is not entitled to evidentiary effect as prima facie evidence of the validity or amount of the claim pursuant to Rule 3001(f) of the Fed. R. Bankr. P. because it lacks critical facts and documentation necessary for Owner to verify the Claimed Amount, and (ii) the Claim for "Yield Maintenance Default Premium," of $2,542,737.63, should be disallowed as a matter of law.[6]

29.     By Memorandum Decision and Order Granting Summary Judgment Regarding the Enforceability of Yield Maintenance Default Premium, dated March 18, 2019, this Court

---

[6]     In the First Objection, Debtors expressly reserved their "right to further amend, supplement, revise, object or otherwise respond to the Claim on any and all additional factual or legal grounds relevant to the Claim, …"  (ECF Doc. No. 84).

01101923.13

overruled Debtors' Objection with regard to Yield Maintenance Default Premium, and

determined that such Claim is enforceable under New York law.  (ECF Doc. No. 132).

However, the amount of the Claim remains to be determined.

30.     Upon information and belief, on or about April 18, 2019, Wilmington sold and

assigned to TCG all of its rights and interest in Note A, including Wilmington's rights and

interest in the pre-petition claims asserted in the POC.

31.     On April 25, 2019, TCG sent Debtor's counsel a purported "Updated Payoff

Amount," which impermissibly:  (i) adds new categories of claims to the original POC "Special

Servicing Fees," and "Insurance Advances;" (ii) adds interest and default interest on the alleged

"Tax Advances" and attorneys' fees, in contravention of the Loan Agreement; and (iii) raises the

total amount of its pre-petition claim by approximately $2 million, from $32,048,285.29 to

$34,173,235.94.  *See* Ex. C.  TCG did not file this "updated" payoff calculation or an updated

POC in the Claims Register.  Its "Updated Payoff Amount" Claims violates this Court's Order

dated September 24, 2018 establishing a bar date (ECF Doc. No. 63), and should therefore be

disallowed.

32.     On May 9, 2019, this Court issued its Findings of Fact, Conclusions of Law, and

Order (I) Approving Disclosure Statement on a Final Basis Pursuant to 11 U.S.C. § 1125; and

(II) Confirming First Amended Plan of Reorganization of 1141 Realty Owner LLC and

Flatironhotel Operations LLC under Chapter 11 of the Bankruptcy Code Pursuant to 11 U.S.C. §

1129 and Fed. R. Bankr. P. 3020 (the "Plan Confirmation Order").  *See* Plan Confirmation Order

[ECF Doc. No. 159].  The Effective Date of the Plan occurred on May 14, 2019.

33.     Pursuant to the Plan Confirmation Order (at p. 19), this Court amended Section

3.06 of the Plan and directed that an amount (not less than $6.75 million) sufficient to pay

disputed amounts of the Prepetition Lender's Claims (*i.e.*, the POC) be held in a Disputed Claims Reserve, subject to further agreement of the parties or further order of the Court. *See* Plan Confirmation Order, at p. 19 [ECF Doc. No. 159].

34.     Pursuant to the approved Plan of Reorganization, on May 15, 2019, all of 1141 Realty LLC's ownership interests were cancelled, new ownership interests were issued to Premier Nomad, LLC, and TCG's loan was deemed satisfied, subject to the terms of the Plan and the Plan Confirmation Order with regard to the Disputed Claims Reserve.

35.     Debtor files this objection to TCG's: (1) POC; (2) Administrative Claim; and (3) TCG's purported "Updated Payoff Amount" Claims.

## **RELIEF REQUESTED**

36.     By this Objection, Debtor requests entry of an order disallowing portions of the Claims, or the amount of the Claims, as a matter of law, based on the grounds set forth herein.

## **BASIS FOR RELIEF**

37.     Pursuant to 11 U.S.C. § 502(a), a filed proof of claim is deemed allowed, unless a party in interest objects thereto. Rule 3001(f) provides for prima facie validity of a claim, provided that it is in compliance with the Bankruptcy Rules. *See* Fed. R. Bankr. P. 3001(f). Rule 3007 of the Bankruptcy Rules provides that an objection to a proof of claim must be in writing, and that the claimant must be provided with not less than thirty (30) days' notice of the hearing to be held in respect of such objection. *See* Fed. R. Bankr. P. 3007(a).

11

01101923.13

## ARGUMENT

**I.    TCG'S DEFAULT INTEREST CLAIMS SHOULD BE DISALLOWED BECAUSE THERE WAS NO EVENT OF DEFAULT AND, THUS, NO LEGITIMATE BASIS FOR ACCELERATING THE LOAN**

38.    TCG Claims seek pre- and post-petition default interest on the outstanding principal amounts of the notes, as follows: (i) under the POC, TCG seeks the total amount of $3,155,801.16 ($2,911,526.48 for Note A, and $244,274.68 for Note B); (ii) in its improper "Updated Payoff Amount" calculation, TCG improperly attempts to increase its Claim to $4,136,924.62 ($3,824,275.78 for Note A, and $312,648.84 for Note B); and (iii) TCG's Administrative Claim for post-petition default interest seeks $2,144,942.92 ($1,846,349.93 for Note A, and $298,592.99 for Note B).  For the reasons set forth below, Debtor objects to these Claims.

**A.    *Wilmington's Default and Acceleration Notice Was Invalid and a Legal Nullity***

39.    Under New York law, a lender must strictly comply with the contract provisions governing notice of default and acceleration of its loan.  *See Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.*, 24 Misc.3d 1222(A) at *15, 897 N.Y.S.2d 669 (Sup. Ct., Ond. Cty.), *aff'd in part and modified in part*, 69 A.D.3d 212 (4th Dep't 2009); *Dale v. Industrial Ceramics, Inc.*, 150 Misc.2d 935, 937, 571 N.Y.S.2d 185 (Sup. Ct., N.Y. Cty. 1991) (holding that notice provisions under promissory note that trigger acceleration of loan must be strictly construed).

40.    A lender's strict compliance with the default provisions is required because, where there is no basis to accelerate a mortgage obligation, an acceleration notice sent by the lender is a nullity and constitutes a material breach of the loan agreement.  *Seidman v. Indus. Recycling Props., Inc*., 106 A.D.3d 983, 984-985, 967 N.Y.S.2d 77 (2d Dep't 2013) (lender's improper acceleration of mortgage loan and commencement of foreclosure action constituted a

12

01101923.13

breach of loan agreement); *Luxonomy Cars, Inc. v. Citibank, N.A.*, 65 A.D.2d 549, 550, 408
N.Y.S.2d 951 (2d Dep't 1978) (lender's wrongful acceleration of note as predicate for
foreclosure action was an actionable breach of contract); *cf. Rocky Aspen Management 204 LLC
v. Hanford Holdings LLC*, 16 Civ. 4270 (VM), 2018 WL 3471809, at *12 (S.D.N.Y. June 28,
2018), *subsequent determination*, 358 F.Supp.3d 279 (S.D.N.Y. Jan. 30, 2019), *aff'd in part,
vacated in part*, 2019 WL 1447260 (S.D.N.Y., Mar. 8, 2019) (allegations that lender wrongfully
accelerated loan by wrongfully declaring a default stated a breach of contract claim); *Household
Fin. Realty Corp. of NY v. Dunlap*, 15 Misc.3d 659, 665, 834 N.Y.S.2d 438 (Sup. Ct., N.Y. Cty.
2007) (where "there was no basis for the acceleration of the mortgage, and the acceleration
notice plaintiff sent was premature and therefore improper," "[i]t cannot form the predicate basis
for this foreclosure action …."").

41.     Pursuant to these principles, Wilmington was required to strictly comply with the
various provisions in the Loan Agreement governing the "Events of Default" that constituted a
basis for accelerating the loan.  It was not permitted to concoct an "Event of Default" or expand
its definition, but that is exactly what it did.

42.     Under Section 4.1.24 of the Loan Agreement, Debtor was required to "maintain
the Liquor License(s)" and "cause each Liquor License to be continuously renewed at all times
…."  *See* Ex. F, Loan Agreement, at § 4.1.24.  Similarly, under the Management Agreement,
Debtor was required to keep all operating licenses "in full force and effect."  *See* Ex. G,
Management Agreement, at § 1.03(A)(11).  As discussed below, those requirements were fully
satisfied by Debtor.  The Liquor Licenses had not been revoked, cancelled or suspended by the
SLA and were thus in full force and effect.

01101923.13

43.      The *only* enumerated "Event of Default" concerning the Liquor Licenses is found in Section 7.1(xii) of the Loan Agreement, which states that an Event of Default occurs "if, without Lender's prior written consent, any required license, permit, including, without limitation, the Liquor License[s], relating to the Property ***ceases to be in full force and effect***." *See* Ex. F, Loan Agreement, at § 7.1(xii) [emphasis added].  Because it is indisputable that the Liquor Licenses were "in full force and effect" when Wilmington served its Default and Acceleration Notice, there was no actual Event of Default under Section 7.1(xii).

44.      Consequently, in violation of New York law, Wilmington improperly declared an "Event of Default" that did not exist under Section 7.1(xii) of the Loan Agreement and accelerated the loan based on that fabricated "Event of Default."

       1.     ***New York State Alcoholic Beverage Control Law Governing Liquor Licenses***

45.      New York State Alcoholic Beverage Control Law ("ABC") § 119 dictates that a liquor license issued by the SLA may be revoked, cancelled or suspended and/or a licensee may be subjected to the imposition of a monetary penalty.  However, in order to revoke, cancel, suspend a license or subject a licensee to a monetary penalty a hearing must be held at which the SLA would have to find sufficient cause.  *See* ABC § 119(1)-(3); *see also Brenner v. Bruckman*, 253 A.D. 607 (1st Dep't 1938), *appeal dismissed*, 278 N.Y. 503 (1938) (hearing required before license can be cancelled); *Yates v. Mulrooney*, 245 A.D. 146, 149 (4th Dep't 1935) (same).

46.      Significantly, until a license is revoked by the SLA, it remains effective for the sale of liquor at the licensed premises.  *See Kelly v. Casale*, 263 A.D.2d 889, 890, 695 N.Y.S.2d 184 (3d Dep't 1999), *lv. to appeal denied*, 94 N.Y.2d 754, 701 N.Y.S.2d 340 (Table) (1999) (during interim renewal of petitioner's liquor license, until it was revoked by SLA, petitioner was allowed him to continue to sell alcohol using license).

14

### 2. *Debtor's Liquor Licenses Were in "Full Force and Effect"*

47.     When Wilmington served its Default and Acceleration Notice on September 15, 2017, alleging that Debtor "failed to maintain valid and effective liquor licenses issued by the New York Liquor Authority permitting Borrower to serve alcoholic beverages at the Property," it is indisputable that the Liquor Licenses were all "in full force and effect."  No action had been taken by the SLA to revoke, cancel or suspend them before Wilmington brought its foreclosure action.

48.     Indeed, in its foreclosure action, Wilmington conceded that the Liquor Licenses were "active" at the October 2, 2017 hearing of its motion for appointment of a receiver, stating: "We don't disagree that they're active."  *See* Ex. J, October 2, 2017 Order/Transcript, at p. 23.  It also attached printouts from the SLA website to its Amended Complaint, showing that the three Liquor Licenses were "active."  *See* Ex. O, SLA printouts, attached as Exhibit "T" to the Amended Complaint.  Because the Liquor Licenses were "maintained" and "in full force and effect," as required, respectively, under the precise terms of §§ 4.1.24 and 7.1 of the Loan Agreement, Wilmington's Default and Acceleration Notice was invalid and a legal nullity as a matter of law.

### B. *Wilmington Wrongfully Accelerated the Loan, in Material Breach of the Loan Agreement*

49.     In the absence of a valid "Event of Default" based on Section 7.1(xii) of the Loan Agreement, there was no legitimate basis for Wilmington to have accelerated the loan. Accordingly, Wilmington materially breached the Loan Agreement by wrongfully accelerating the loan and commencing its foreclosure action.  *See Seidman*, 106 A.D.3d at 984-985, 967 N.Y.S.2d 77; *Luxonomy Cars, Inc.*, 65 A.D.2d at 550, 408 N.Y.S.2d 951.

15

01101923.13

50.     Furthermore, without an Event of Default that triggered the accrual of default interest under Section 2.2.1 of the Loan Agreement, no default interest is due.  For this reason, all of TCG's Claims for pre-petition and post-petition default interest on the principal amount of the loan should be disallowed in their entirety as a matter of law.

51.     Indeed, Wilmington's counsel conceded to the District Court that a finding that there was no default would adversely affect Wilmington's ability to charge interest at the default rate, as follows:

> THE COURT:  Well, it's at the default rate subject to a finding of default, I presume.  There is a dispute whether there has been an event of default.
>
> MR. HART:  That's right, Your Honor.  If you were ultimately at the conclusion of the foreclosure proceedings to determine that there was not a default, that would significantly impact our ability to charge default interest, but that isn't our position.  Our position is that interest is accruing at the default rate.

*See* Ex. J, October 2, 2017 Order/Transcript, at p. 4.

**C.      *Wilmington Failed to Demonstrate any Actual "Event of Default" Based on the Liquor Licenses***

52.     None of the arguments Wilmington raised in the District Court foreclosure action support its claim that Debtor defaulted under the Loan Agreement by failing to maintain the Liquor Licenses "in full force and effect."  In fact, the District Court rejected every one of Wilmington's arguments when it denied its motion for a receiver.

53.     One such argument was Wilmington's allegation that the Original Manager, the Licensees and Chan no longer had a role in the management or operation of the Hotel on the date Wilmington delivered its Default and Acceleration Notice, and, as a result, the Hotel did not have a valid liquor license and was selling alcohol illegally.  *See* Ex. I, Wilmington's Amended Complaint, at ¶ 50.  However, even assuming, *arguendo*, that Chan no longer was involved in

16

01101923.13

the Hotel's management or operation, the possibility that the SLA *"could have"* revoked, cancelled or suspended the Liquor Licenses does not qualify as an "Event of Default" under Section 7.1 of the Loan Agreement.[7]  Nor did the District Court believe that it was an adequate basis for appointment of a receiver.

54.    Nor does the termination of the Original Manager or the Management Agreement qualify as an "Event of Default."  If Wilmington had desired to predicate an "Event of Default" on the *mere possibility* that the Liquor Licenses *could be* revoked or that there was a change in the management of the Hotel, the loan documents should have so stated.

55.    The invalidity of Wilmington's Default and Acceleration Notice is further obvious from the lack of any provision in the Loan Agreement, Management Agreement, or the Agreement Regarding Liquor Licenses, that obligated Debtor to serve *alcoholic* beverages at the Hotel.  *See* Ex. P, Agreement Regarding Liquor Licenses, attached as Exhibit "P" to Amended Complaint.  Nor is there any requirement that the operation of Debtor as a "boutique hotel" (*see* Ex. F, Loan Agreement, at § 4.1.19) obligated it to serve *alcoholic* beverages.

56.    Instead, the Management Agreement simply required the Manager to "[p]rovide food and beverage services."  *See* Ex. G, Management Agreement, at § 1.03(A)(10).  Thus, Wilmington's allegation in the Amended Complaint (at ¶ 53), that "Borrower's failure to operate the Property in the same manner it was operated [in] as of the Closing Date has resulted in an Event of Default under Section 7.1(xiv) of the Loan Agreement," is wrong.

57.    Nor was Wilmington permitted to rely on this alleged "failure to operate" as a substitute for its invalid Liquor License default notice, or as an alternative basis to retroactively

---

[7]    Section 7.1, subsections (i)-(xv) of the Loan Agreement enumerated certain "Events of Default" that did not require any notice and cure period.  *See* Ex. F, Loan Agreement, at § 7.1(i)-(xv).  Section 7.1(xvi) of the Loan Agreement provided for notice and cure for defaults that were not enumerated in Section 7.1, subsections (i)-(xv) of the Loan Agreement.  *See id.* at § 7.1(xvi).

17

justify its acceleration of the loan.  As a matter of law, "[o]nce a party declares a default on one ground under New York law, it may not subsequently defend the declaration of default on a different ground."  *See Destiny USA Holdings*, 24 Misc.3d 1222(A), at *15, 897 N.Y.S.2d 669 (Table) (citing *Leventhal v. New Valley Corp.*, No. 91 Civ. 4238 (CSH), 1992 WL 15989, at *5 (S.D.N.Y. Jan. 17, 1992) ("It is well settled that where a party to a contract terminates the contract and presents a specific reason for the termination, that party is estopped from raising a different reason upon the commencement of an action.")).

**D.    *Wilmington's Notice of Additional Defaults and Notice of Additional Events of Default Were Invalid and a Nullity***

58.    When Wilmington served its Amended Complaint, besides adding individual defendants, it added new allegations of Debtor's wrongdoing based on its delivery to Debtor of a "Notice of Additional Defaults," dated October 11, 2017 (*see* Ex. Q), followed by its delivery of a "Notice of Additional Events of Default," dated December 7, 2017 (*see* Ex. R).[8]  Both notices were delivered to Debtor *subsequent* to Wilmington's acceleration of its loan and commencement of its foreclosure action.

59.    However, because Wilmington was barred under New York law from asserting any other alleged defaults as an alternative basis for its acceleration of the loan and commencement of the foreclosure action (*see Destiny USA Holdings*, 24 Misc.3d 1222(A), at *15, 897 N.Y.S.2d 669 (Table)), its Notice of Additional Defaults and Notice of Additional Events of Default were invalid, null and void as a matter of law.

60.    This conclusion is supported by the District Court's ruling, in its October 2, 2017 Order denying Wilmington's motion for a receiver, finding:  "Here the trustee commenced this

---

[8]    The notices alleged the following defaults:  "Failing to Deposit Rents and Income;" "Failing to Enter Into A Replacement Management Agreement With A Qualified Manager;" "Failing To Operate The Hotel As Required By The Express Language of The Loan Documents;" "Failing To Pay Taxes;" "Failing To Submit Annual Operating Budget;" and "Liens Recorded Against The Hotel."

18

foreclosure action before properly noticing any of these alleged defaults, denying the borrower

the opportunity to cure them." *See* Ex. J, October 2, 2017 Order/Transcript, at p. 20-21. Thus,

Debtor had no ability to cure any of the alleged additional defaults once the loan was accelerated

and the foreclosure action was commenced.

### E.    *TCG's Entire "Updated Payoff Amount" Calculation Should be Disallowed*

61.    Debtor further objects to all of the Claims asserted in TCG's April 25, 2019

purported "Updated Payoff Amount" calculation. It impermissibly:  (i) added new categories of

claims to the original POC "Special Servicing Fees," and "Insurance Advances;" (ii) added

interest and default interest of the alleged "Tax Advances" and attorneys' fees, in contravention

of the Loan Agreement; and (iii) raised the total amount of its pre-petition claim by

approximately $2 million, from $32,048,285.29 to $34,173,235.94. *See* Ex. C.

62.    TCG's so-called "update" was never filed in the Claims Register in this case. It

violates this Court's bar date Order, of September 24, 2018, (ECF Doc. No. 63), by

impermissibly seeking to add new categories of Claims to the POC after the November 5, 2018

bar date, and to raise the overall amount of the pre-petition Claims. All of TCG's new or

recalculated Claims in its "Updated Payoff Amount" should all be disallowed.

## II.    TCG'S DEFAULT INTEREST CLAIMS SHOULD BE DISALLOWED DUE TO WILMINGTON'S BAD FAITH, PREDATORY CONDUCT TOWARDS DEBTOR

### A.    *Wilmington Breached its Duty of Good Faith and Fair Dealing Owed to Debtor Under the Loan Agreement*

63.    Even *before* Wilmington served its Default and Acceleration Notice and

commenced its foreclosure action, Wilmington committed bad faith, predatory practices against

Debtor by intentionally withholding its operating funds, which rightfully belonged to Debtor and

were needed to pay the Hotel's expenses, as leverage to coerce Debtor to consent to the

01101923.13

appointment of a receiver.  *See* Ex. H, Vaswani Dec.; *see also* Ex. L, Amended Answer and

Counterclaims, at §§57-95.

64.    Such predatory tactics are well-documented in several emails sent by

Wilmington's loan servicer, Midland Loan Services, which maintained and controlled Debtor's

bank accounts for Wilmington pursuant to the Cash Management Agreement.  *See* Ex. S, Cash

Management Agreement.  In particular, in a September 7, 2017 email from Kevin Semon to

Debtor's principal, Semon states:

> … I will not recommend a funding for the OPEX at this time.  If
> the Borrower stipulates to the appointment of a receiver acceptable
> to lender, I would release funds as warranted to the receiver to
> assure an efficient operation of the hotel.

*See* Ex. H, Vaswani Dec., at ¶ 13, and Ex. E thereto.

65.    Thereafter, on September 28, 2017, shortly after the foreclosure action was

commenced, but before Wilmington's motion for a receiver was heard by the District Court,

Semon sent another email to Debtor, again threatening to withhold operating funds from Debtor

unless it agreed to a receiver.  He states:

> Due to the identified events of default under the note, the Lender
> will not fund operating expenses until there is either a mutually
> acceptable third party or the appointment of a receiver to operate
> the F&B business.

*See* Ex. H, Vaswani Dec., at ¶ 14, and Ex. F thereto.  Later that same day, Semon sent another

email to Debtor stating that unless it agreed to a receiver, Debtor's principal, Vaswani, would

have to use his own monies to fund the Hotel's payment of its vendors and staff:

> The F&B concerns could be timely resolved via the receiver.  I
> understand from our prior communications that you have
> supported the operating deficits at this hotel in the past noting
> advances totaling in excess of $200,000.  I recommend that you
> continue to fund the operating deficits to assure the timely payment
> of vendors and staff.

01101923.13

*See* Ex. H, Vaswani Dec., at ¶ 15, and Ex. F thereto.  Wilmington's bad faith conduct,

tantamount to blackmail, continued until the District Court intervened.

66.     Indeed, the District Court in the foreclosure action expressly acknowledged

Debtor's evidence of Wilmington's bad faith conduct, stating "the borrower has raised at least

questions about whether the [Lender's] conduct leading up to the filing of this [foreclosure]

action has been in good faith."  *See* Ex. J, October 2, 2017 Order/Transcript, at p. 21.

67.     What appears to have been motivated by Wilmington's bad faith retaliation for

Debtor's refusal to consent to a receiver, Wilmington concocted a default based on the Liquor

Licenses, with no opportunity to cure, rather than request Debtor to comply with the procedures

and conditions *expressly* contemplated under Sections 4.1.12[9] and 4.1.24(b) of the Loan

Agreement for transfer of the Liquor Licenses to Debtor or to an entity affiliated with Vaswani.

*See* Ex. F, Loan Agreement, §§ 4.1.12 and 4.1.24(b).

68.     Wilmington's ultimate goal appears to have been to terminate Debtor's low

interest (4.9%) loan, and collect a large defeasance fee (then, approximately $4 million)

predicated on the early termination of the loan that Wilmington itself caused.  *See* Ex. H,

Vaswani Dec., at ¶ 19.  In light of the clear evidence of Wilmington's repeated bad faith conduct,

TCG's Claim for pre-petition default interest should be disallowed in its entirety.

69.     The Court has full authority and discretion to disallow TCG's Claim for pre-

petition default interest, which is governed by New York law (*see In re Residential Capital,*

*LLC*, 508 B.R. 851, 856 (S.D.N.Y Bankr. 2014)).  *See* Ex. F, Loan Agreement, at § 9.3.  "In an

action of an equitable nature, the recovery of interest is within the court's discretion," and "[t]he

exercise of that discretion will be governed by the particular facts in each case, including any

---

[9]      Section § 4.1.12 of the Loan Agreement, entitled "Transfers," specifics the terms and conditions for
transfer of the Liquor Licenses.  *See* Ex. F, Loan Agreement § 4.1.12.

21

wrongful conduct by either party." *See Citicorp Trust Bank, FSB v. Vidaurre*, 155 A.D.3d 934,

935-936, 65 N.Y.S.3d 237 (2d Dep't 2017) (rejecting claim for interest that accrued during

period of time tolled by lender's misconduct in delaying prosecution of foreclosure action);

*Dayan v. York*, 51 A.D.3d 964, 965, 859 N.Y.S.2d 673 (2d Dep't 2008), *lv. to appeal denied*, 12

N.Y.3d 839, 881 N.Y.S.2d 13 (Mem) (2009).

**B.** **_Assuming, Arguendo, that Default Interest is Allowed, it Should be Limited to Default Interest Accruing_ <u>After</u> _September 15, 2017, Not Retroactively from January 6, 2016_**

70.     Assuming, *arguendo*, that the Court allows TCG's Claims for default interest over

Debtor's present objection, this Court should limit its allowance of TCG's pre-petition default

interest Claim to such interest that accrued **after September 15, 2017** – the date the Default and

Acceleration Notice was delivered to Debtor – and <u>not</u> retroactively from January 6, 2016.[10]

71.     Imposing this limit on default interest also would serve as redress for

Wilmington's bad faith tactics against Debtor and its intentional delay of the foreclosure action,

by waiting almost (21) months before serving its Default and Acceleration Notice, without any

opportunity to cure and retroactively charging default interest.

**C.** **_TCG's Claims for Pre- Petition Default Interest are Incorrectly Calculated and Inflated_**

72.     Pre-petition Default Interest should be calculated at the default interest rate of

9.913% (4.913% non-default rate + 5% default rate) starting on September 17, 2017, the date the

default was noticed, through the July 31, 2018 Petition Date.  The result is a total of

$1,058,314.66 ($986,596.33 for Note A + $71,718.33 for Note B).  *See* Exhibit CC.  Debtor's

---

[10]     Wilmington's POC, in footnotes 4 and 5, indicates January 6, 2016 as the date its pre-petition default interest Claim started to accrue.  There is no basis asserted in the Claim to retroactively assert default interest more than 20 months prior to the Default and Acceleration Notice.  Presumably, the 6th day of the month is used because payments on Debtor's loan obligation were made by Wells Fargo Bank, Wilmington's Master Servicer under the Cash Management Agreement, from Debtor's Cash Management on the 6th calendar day of every month.  *See* Ex. I, Amended Complaint, at ¶¶ 19, 20.

calculation also takes into account a principal payment of $1,232,055.13 in May 2018.  It is not clear whether TCG has taken that payment into account in its calculation.

### D.    *TCG's Entire Claim for Post-Petition Default Interest Should Be Disallowed in Order to Avoid Bestowing a Windfall on TCG*

73.    TCG's Administrative Claim for post-petition default interest, in the amount of $2,144,942.92, should be disallowed in its entirety because there is no valid basis for TCG to recover *any* post-petition default interest.

74.    When TCG purchased Note B from the original lender, Rialto (Note B was owned by RMezz Flatiron LLC ("RMezz")), it did so after Wilmington had commenced the foreclosure action against Debtor.  Apparently, TCG's goal was to eventually own the Hotel – which it unsuccessfully attempted to purchase on at least two prior occasions, in 2013 and 2014.

75.    TCG purchased Note A from Wilmington in April 2019, after Debtor had filed for bankruptcy in July 2018.  Now, even though Wilmington is the only entity that could have sustained any losses as a result of its foreclosure of the loan, TCG is attempting to obtain a windfall by inflating its Claims, adding new claims that Wilmington did not assert in its POC, and seeking an additional $2,144,942.92 in post-petition default interest even though it will be fully repaid for pre-petition interest on the entire Note A debt, which it owned for only 1 month. TCG should be prevented from obtaining such a windfall by disallowing its Claim for $2,144,942.92 in post-petition default interest.

76.    In the event TCG is permitted to recover any post-petition default interest, its calculation is also incorrect as it apparently has used an interest rate higher than the 9.913% default rate set forth in the Loan Agreement for Note A and 18.19% allowable for Note B. Debtor's calculation shows that the proper calculation for post-petition default interest through

01101923.13

the May 16, 2019 effective date of the Plan at 9.913% establishes an amount of $1,910,507.34.

*See* Ex. DD.

## III.    DEFAULT INTEREST ON ITEMS OTHER THAN PRINCIPAL AND ACCRUED INTEREST SHOULD BE DISALLOWED, AS CONTRARY TO THE LOAN AGREEMENT

77.    In TCG's "Updated Payoff Amount" Claim calculation, it improperly added new

Claims for interest and default interest *on top of* the amounts of its Claims for "Tax Advances"

and its so-called "Property Protection Advances" Claim for pre-petition attorneys' fees, as

follows:  (1) $22,691.74 interest and $23,093.56 default interest on "Tax Advances," and (2)

$49,568.69 interest and $50,446.46 default interest on attorneys' fees.  For the reasons set forth

below, Debtor objects to these Claims.

78.    TCG has not identified any contractual or other basis to receive such interest and

default interest on tax advances and attorneys' fees, and it is not supported by the Loan

Agreement.  Under Section 2.2.1 of the Loan Agreement, interest and default interest accrue only

on principal and overdue interest.  Section 2.2.1 expressly provides:

> … Upon the occurrence and during the continuance of an Event of
> Default, (a) the Note A Outstanding Principal Balance and, to the
> extent permitted by law, overdue interest in respect of the Note A,
> shall accrue interest at the Note A Default Rate, and (b) the Note B
> Outstanding Principal Balance and, to the extent permitted by law,
> overdue interest in respect of the Note A, shall accrue interest at
> the Note B Default Rate. …

*See* Ex. F, Loan Agreement, at § 2.2.1.  This language must be strictly construed against TCG.

Indeed, reasonable attorney's fees does not include interest and default interest thereon.

79.     In the absence of any provisions in the Loan Agreement or other Loan Documents that entitle TCG to charge interest and default interest on tax advances or attorneys' fees, TCG's Claims for such interest and default interest should be disallowed.[11]

## IV.    TCG'S CLAIMS FOR PRE-PETITION ATTORNEYS' FEES SHOULD BE DISALLOWED BECAUSE WILMINGTON WRONGFULLY ACCELERATED THE LOAN AND BROUGHT ITS FORECLOSURE ACTION

80.     In the POC, TCG's Claim for pre-petition attorneys' fees (its so-called "Property Protection Advances" Claim) is in the amount of $1,930,210.58.  In TCG's improper Updated Payoff Amount calculation, TCG attempts to raise its Claim for such pre-petition attorneys' fees to the amount of $2,054,922.95 for Note A, and $691.52 for Note B, for a total sum of $2,055,614.47.  For the reasons set forth below, Debtor objects to these Claims.

81.     Because Wilmington's entire foreclosure action was wrongfully predicated on an improper "Event of Default" and its wrongful acceleration of the loan, in breach of the Loan Agreement, TCG's entire "Property Protection Advances" Claim for pre-petition attorneys' fees and expenses charged by Sidley Austin, LLP ("Sidley"), in the amount of $1,930,210.58, should be disallowed because all of the fees and expenses were charged in connection with Wilmington's improper acceleration of the loan and foreclosure action.  *See* Ex. U, Sidley Austin, LLP invoices.

## V.    IN THE EVENT ANY OF TCG'S CLAIM FOR PRE-PETITION ATTORNEYS' FEES IS ALLOWED, CERTAIN CHARGES SHOULD BE DISALLOWED AS UNREASONABLE, EXCESSIVE, DUPLICATIVE, OR UNSUBSTANTIATED

82.     TCG's so-called "Property Protection Advances" Claim for pre-petition attorneys' fees is asserted under Section 9.13 of the Loan Agreement, which provides for the recovery of "reasonable attorneys' fees and disbursements incurred by Lender."

---

[11]     If TCG argues that "Property Protection Advances" accrue interest and default interest, its use of such moniker to improperly obtain interest and default interest should be rejected.

01101923.13

A.    *New York Law Governing Pre-Petition Attorneys' Fees*

83.    Section 9.13 of the Loan Agreement "may only be enforced to the extent that the amount is reasonable and warranted for the services actually rendered." *See* Citicorp *Trust Bank, FSB*, 155 A.D.3d at 935-936 (citing *People's United Bank v. Patio Gardens III, LLC*, 143 A.D.3d 689, 691, 38 N.Y.S.3d 262 (2d Dep't 2016); *Vigo v. 501 Second Street Holding Corp.*, 121 A.D.3d 778, 779, 994 N.Y.S.2d 354 (2d Dep't 2014)).

84.    "In determining reasonable compensation for an attorney, the court must consider such factors as the time, effort, and skill required; the difficulty of the questions presented; counsel's experience, ability, and reputation; the fee customarily charged in the locality; and the contingency or certainty of compensation. *See* Citicorp *Trust Bank, FSB*, 155 A.D.3d at 935-936 (quoting *Vigo*, 121 A.D.3d at 780 (citing *Green v. Silver*, 79 A.D.3d 1097, 1098, 913 N.Y.S.2d 574 (2d Dep't 2010)). An applicant seeking to recover its attorneys' fees must provide the Court with "sufficient information upon which to make an informed assessment of the reasonable value of the legal services rendered." *Citicorp Trust Bank, FSB*, 155 A.D.3d at 935 (citing *People's United Bank*, 143 A.D.3d at 691). "There must be a sufficient affidavit of services, detailing the hours reasonably expended ... and the prevailing hourly rate for similar legal work in the community." *Citicorp Trust Bank, FSB*, 155 A.D.3d at 935 (rejecting plaintiff's counsel's affirmation of services because it failed to set forth counsel's experience, ability, and reputation, and failed to detail the prevailing hourly rate for similar legal work in the community) (quoting *SO/Bluestar, LLC v. Canarsie Hotel Corp.*, 33 A.D.3d 986, 988, 825 N.Y.S.2d 80 (2d Dep't 2006)).

01101923.13

**B.**    ***TCG's Pre-Petition Claim for Attorneys' Fees Should be Disallowed as Unreasonable, Excessive, Duplicative, or Unsubstantiated***

85.    On its face, the amount of TCG's Claim for pre-petition attorneys' fees – whether based on the POC, in the amount of $1,930,210.58, or TCG's improper Updated Payoff Amount calculation, in the amount of $2,055,614.47 – is exorbitant, especially considering the relatively short ten (10) month duration of the work, from September 5, 2017 to July 31, 2018. *See* Ex. U, copies of Sidley's invoices supporting its Claim.  As an example, Wilmington unnecessarily drove up the billable hours spent litigating the foreclosure action by pursuing a baseless and unnecessary receivership motion, which the District Court denied.  The fees for that unwarranted motion alone amounted to over $100,000, all of which should be disallowed.

86.    Furthermore, the hourly billing rates charged by Sidley attorneys to perform their legal services were extremely high in light of the relatively straight-forward legal services required in a foreclosure action.  The hourly rates ranged from $301.75 to $1,147.50.

87.    In total, Sidley's attorneys spent a total of 2,484.7 hours performing pre-petition legal services, and charged approximately $2,083,388 for their legal services, resulting in a blended hourly rate of approximately $838.50 per hour for a routine mortgage foreclosure action.

88.    In particular, one Sidley partner, "EW Walker," billed 1,163.7 hours and charged Wilmington $998.75 - $1,062.50 per hour for his time, for a total of $1,121,173.50 – an amount equal to approximately one half of Sidley's total pre-petition fees.  There can be no valid justification for a senior partner having spent that much time, and having charged that high a fee to litigate a foreclosure action.  It appears that virtually no discovery had occurred, except for mandatory initial disclosures and the matter never reached a summary judgment motion.  Less senior attorneys with lower billing rates surely would have sufficed.

01101923.13

89.     In contrast, Debtor's attorneys billed less than ¼ of TCG's Claim for their legal services in connection with the foreclosure action and other matters. *See* Ex. W, Claim No. 11 filed in the Claims Register in this proceeding by Robinson Brog Leinwand Greene Genovese & Gluck P.C. on October 31, 2018; and Ex. X, copies of its invoices supporting its claim. A review of those charges, which total $496,290.12, clearly shows that a portion of these fees did not even apply to the foreclosure action.

90.     Certainly, Robinson Brog's legal fees for representing the Debtor/borrower in the foreclosure action could serve as one measure by which to determine the reasonableness of fees for the Lender's counsel's pre-petition legal services, especially here where lender's legal fees are excessively more than Debtors'. The legal services performed by Debtor's counsel were comparable to, if not broader them, to those performed by Sidley for Wilmington in the foreclosure action. The Robinson Brog attorneys that represented Debtor possessed comparable skills, experience and professional reputation, as compared to Sidley's attorneys who performed the legal services for Wilmington at issue.

91.     In addition, certain legal fee charges set forth in Sidley's invoices are blatantly unreasonable, excessive, duplicative, or unsubstantiated, and should be disallowed. Furthermore, Sidley's invoices contain numerous redactions that omit all details of the work performed, and make it impossible to determine its reasonableness. *See* Ex. U, copies of Sidley's invoices.

92.     By letter dated August 19, 2019, a request was made by counsel for Debtor to TCG's in house and outside counsel to produce unredacted invoices for such legal services rendered by Sidley. *See* Ex. Y.

01101923.13

93.     By email dated August 19, 2019 (Ex. Z), Justin Amirian of Delshah Capital, responded by saying he was "looping in our litigation counsel, Bill Savino. I will let him respond." No response was received.

94.     The Sidley invoices also contain duplicative and unnecessary charges for legal work performed by multiple Sidley attorneys for the same work product or legal service. Examples include attendance by several attorneys at meetings or on telephone conferences, and review by several attorneys of the same work product, where such work by a single attorney would have sufficed. They should be disallowed. Only charges for necessary legal services should be allowed.

## VI.    TCG'S ADMINISTRATIVE CLAIM FOR POST-PETITION ATTORNEYS' FEES SHOULD BE DISALLOWED AS UNREASONABLE, EXCESSIVE, DUPLICATIVE AND UNNECESSARY

95.     TCG asserts an Administrative Claim for post-petition attorneys' fees charged by various law firms for the 9-month period from July 2, 2018 through March 29, 2019, in the total amount of $419,860.64, as follows:  (i) Sidley, in the amount of $355,982.93, (ii) "TKD," in the amount of $13,248.71; "BFK," in the amount of $48,081.00, and (iv) "Woods Oviatt," in the amount of $2,548.00.  For the reasons set forth below, Debtor objects to this Claim.

### A.    *Federal Law Governing Post-Petition Attorneys' Fees*

96.     In the Second Circuit, in order to determine the reasonableness of post-petition attorneys' fees, courts are required to determine the "presumptively reasonable fee." *4 B's Realty 1530 CR39, LLC v. Toscano*, 818 F.Supp.2d 654, 663-664 (E.D.N.Y. 2011).  "The "presumptively reasonable fee" is "comprised of a reasonable hourly rate multiplied by a reasonable number of expended hours."  *4 B's Realty 1530 CR39, LLC*, 818 F.Supp.2d at 644 (quoting *Finkel v. Omega Commc'n Servs., Inc.*, 543 F.Supp.2d 156, 164 (E.D.N.Y. 2008)).  To

determine the "reasonable hourly rate" – *i.e.*, the "rate a paying client would be willing to pay,"

the following factors should be considered:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 190

(2d Cir. 2008) (listing what are referred to as the "Johnson Factors").[12]

97.    Additionally, the court "should bear in mind that a reasonable, paying client

wishes to spend the minimum necessary to litigate the case effectively," and "such an individual

might be able to negotiate with his or her attorneys, using their desire to obtain the reputational

benefits that might accrue from being associated with the case." *Arbor Hill Concerned Citizens

Neighborhood Ass'n,* 522 F.3d at 190.

98.    "The party seeking fees bears the burden of demonstrating that its requested fees

are reasonable." *See Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541 (1984); *Robinson v.

City of N.Y.*, No. 05 Civ. 9545(GEL), 2009 WL 3109846, at *3 (S.D.N.Y. Sept. 29, 2009).

99.    "A fee application must be supported by contemporaneous time records that

"specify, for each attorney, the date, the hours expended, and the nature of the work done." *New

York State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). "[T]he

burden is on the fee applicant to produce satisfactory evidence – in addition to the attorneys' own

---

[12]    The Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York, issued by the Board of Judges for the United States Bankruptcy Court for the Southern District of New York, which are applicable to fee applications, also contain applicable rules governing the information required by this Court.

01101923.13

affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.  A rate determined in this way is normally deemed to be reasonable, and is referred to – for convenience – as the prevailing market rate." *Blum*, 465 U.S. at 895 n.11.

100.    If legal fees are deemed to be excessive, this Court has the authority to reduce the fees by reducing the number of hours billed to a reasonable amount.  *See Seitzman v. Sun Life Assurance Co. of Canada*, 311 F.3d 477, 487 (2d Cir. 2002).

**B.    *TCG's Post-Petition Claim for Attorneys' Fees Should be Disallowed as Unreasonable, Excessive, Duplicative, or Unsubstantiated***

101.    TCG only produced invoices issued by Sidley.  No invoices for legal services performed by TKD, BFK, and Woods Oviatt, were produced by TCG, and its Claims for their attorneys' fees remain unsubstantiated.

102.    The August 19, 2019 written request to TCG to produce all invoices for legal services rendered included those for the law firms referred to as TKD, BFK, and Woods Oviatt. *See* Ex. Y.  TCG failed to respond.  Therefore, TCG's Claim for attorneys' fees billed by TKD, BFK, and Woods Oviatt should be disallowed in the absence of any supporting documentation for such charges.  *See New York State Ass'n for Retarded Children*, 711 F.2d at 1148.

103.    Like its Claim for pre-petition attorneys' fees and expenses, TCG's Administrative Claim for post-petition attorneys' fees charged by Sidley is excessive.  Copies of such invoices, (Exh. "AA") show that Sidley's attorneys spent a total of 524.2 hours performing post-petition legal services, and charged $355,982.93 for their legal services, resulting in a blended hourly rate of approximately $679.10 per hour.  Like its high blended rate for its pre-petition attorneys' fees Claim, this blended rate for its post-petition attorneys' fees is also relatively high and unreasonable.

31

104.    On its face, the Claim also is excessive and should be disallowed to the extent that multiple attorneys performed duplicative and unnecessary legal services where a single attorney alone, or where a junior attorney and one senior attorney/partner could have performed the work.

## VII.    TCG'S CLAIM FOR LATE FEES SHOULD BE DISALLOWED

105.    TCG's "Late Fees" Claim is in the amount of $88,214.65.  For the reasons set forth below, Debtor objects to this Claim.

106.    TCG's Late Fees Claim is barred by New York law.  It is well-settled that, if a mortgage is payable in installments, once a mortgage debt is accelerated by the lender, the entire amount owed under the note and mortgage is due and payable and a borrower no longer has the right to make installment payments.  *Albertina Realty Co. v. Rosbro Realty Corp.*, 258 N.Y. 472, 180 N.E. 176 (1932); *EMC Mtge. Corp. v. Patella*, 279 A.D.2d 604, 720 N.Y.S.2d 161 (2d Dep't 2001); *Federal Nat'l Mortgage Ass'n v. Mebane*, 208 A.D.2d 892, 618 N.Y.S.2d 88 (2d Dep't 2001); *Centerbank v. D'Assaro*, 158 Misc.2d 92, 600 N.Y.S.2d 1015 (Sup. Ct. Suff. Cty. 1993) (holding that, as a consequence of the borrower not being permitted to make installment payments, the lender can no longer collect late charges on the installment payments).  Therefore, late fees on overdue installments cannot be collected.

107.    Consequently, "[i]n the absence of a provision in the mortgage to the contrary, the collection of late fees *after* a mortgage note has been accelerated is impermissible."  *4 B's Realty 1530 CR39, LLC*, 818 F.Supp.2d at 662 [emphasis added] (quoting *Carreras v. Weinreb*, 33 A.D.3d 953, 955, 826 N.Y.S.2d 72, 74 (2d Dep't 2006).  The rationale for this rule is that it is "inconsistent to allow a lending institution to accelerate a note, thereby denying the debtor the right ... to make monthly installments and to continue to insist on its own right ... to impose

32

monthly late charges." *4 B's Realty 1530 CR39,* 818 F.Supp.2d at 662 (quoting *Green Point*

*Sav. Bank v. Varana*, 653 N.Y.S.2d 656, 657 (2d Dep't 1997)).

108.    The Loan Agreement does not expressly provide for late fees to be collected after

the loan has been accelerated.  In Section § 2.2.4, entitled "Late Payment Charge," it provides:

> 2.2.4   <u>Late Payment Charge</u>.  If any principal, interest or any other
> sums due under the Loan Documents (other than the Outstanding
> Principal Balance due and payable on the Maturity Date) is not paid
> by Borrower on the date on which it is due, Borrower shall pay to
> Lender upon demand an amount equal to the lesser of five percent
> (5%) of such unpaid sum or the maximum amount permitted under
> applicable Legal Requirements in order to defray the expense
> incurred by Lender in handling and processing such delinquent
> payment and to compensate Lender for the loss of the use of such
> delinquent payment.   Any such amount shall be secured by the
> Security Instrument and the other Loan Documents to the extent
> permitted by applicable Legal Requirements.   Nothing contained
> herein shall be construed as an agreement or privilege to extend the
> date of the payment of the Debt, nor as a waiver of any other right
> or remedy accruing to Lender by reason of the occurrence of any
> Event of Default.

*See* Ex. F, Loan Agreement, at § 2.2.4.

109.    Inasmuch as TCG's "updated" calculation indicates that all of the late fees were

charged *after* the loan was accelerated, its Claim should be disallowed entirely.

110.    A second basis for disallowing the Late Fees Claim is that Wilmington, through

its loan servicer, Midland Loan Services, directly and exclusively controlled all of Debtor's bank

accounts maintained at Wells Fargo Bank pursuant to the Cash Management Agreement,

including the Lockbox into which Debtor deposited its Hotel revenue, and the Clearing Account

from which Wells Fargo Bank directed payments, on a monthly basis, to pay Debtor's taxes,

insurance, debt service, and other required amounts.  *See* Ex. S, Cash Management Agreement,

at § 3; and Ex. I, Amended Complaint, ¶ 20.

01101923.13

111.    Since Wells Fargo had sole discretion to determine when payments from the

Lockbox and Clearing Account were made to Wilmington in repayment of the loan, and Debtor

had no control over those accounts, late fees should not have been charged to Debtor for any

purported "late payments."

112.    A third basis for disallowing TCG's Late Fees Claim is that, in the event the

default interest Claim is allowed, late fees should not be allowed in order to prevent TCG from

receiving a double recovery.  *See In re 243rd Street Bronx R & R LLC,* 2013 WL 1187859, at *2

(Bankr. S.D.N.Y. March 21, 2013) (rejecting late fees claim where court allowed default interest

because "both forms of compensation redress the same injury, and an award of both would result

in a double recovery").

## VIII.    TCG'S FINANCIALS CLAIM SHOULD BE DISALLOWED

113.    TCG's "Financials" Claim is in the amount of $11,000.  It is purportedly based on

Section 4.1.4(h) of the Loan Agreement, which provides that "if Borrower fails to provide to

Lender the financial statements and other information specified in this Section 4.1.4 within the

respective time periods specified, then, in addition to any other rights and remedies Lender may

have herein or under applicable law, Borrower shall pay to Lender a fee in the amount of $1,000

if such failure continues for fifteen (15) days after notice thereof (provided, however, that Lender

shall not be required to give notice of such failure more than twice in any twelve (12)-month

period) and again upon the expiration of each 30-day period thereafter until compliance is

achieved,…"

114.    TCG's Claim appears to seek a $1,000.00 fee, for eleven months, totaling

$11,000.00.  The burden of proof is on TCG to demonstrate that Debtor failed to provide the

34

required financials.  It failed to satisfy that burden by failing to provide any support for its Claim.

Therefore, it should be disallowed.

## IX.    TCG'S SPECIAL SERVICING FEES CLAIM SHOULD BE DISALLOWED

115.    TCG's Claim for a "Special Servicing Fees" is in the amount of $129,843.75.  It

was improperly added by TCG in its "Updated Payoff Amount" calculation.

116.    Wilmington was permitted under Section 8.3 of the Loan Agreement to use a

special servicer to administer the loan, for which Debtor "was responsible for (i) any reasonable

set-up fees or any other reasonable initial costs and expenses relating to or arising under the

Servicing Agreement and (ii) any reasonable fees and expenses of Servicer (including, without

limitation, reasonable attorneys' fees and disbursements."  TCG's Claim should be disallowed

because Wilmington did not assert any claim for a special servicing fee in its POC.

117.    TCG's Claim also should be disallowed because TCG did not actually pay any

Special Servicing Fee, and the allowance of its Claim would constitute a windfall for TCG.  Its

unsanctioned addition of this Claim to the Wilmington POC is part and parcel of its overall

strategy to recover as much money from Debtor as possible, but without having sustained any

loss or risk.  Its attempt to manufacture Claims should not be countenanced by the Court.

118.    On August 19, 2019, a written request was made to TCG to produce

documentation supporting its Special Servicing Fees Claim.  *See* Ex. Y.  It failed to do so.

Therefore, TCG's Claim also should be disallowed in the absence of any documentation to

support its Claim.

## X.    TCG'S WORKOUT FEE CLAIM SHOULD BE DISALLOWED

119.    TCG's Claim for a "Workout Fee" is in the amount of $302,532.76.  Its "updated"

calculation indicates that this Claim is calculated as a 1% fee on the outstanding "payoff"

35

01101923.13

amount of the loan for work allegedly performed by Wells Fargo Bank as Wilmington's agent. There is no basis for its Claim.

120.    Workout fees are governed by Section 8.3 of the Loan Agreement, which, in part, provides that the loan may be serviced by a loan "Servicer," and "Borrower shall be responsible for (i) any reasonable set-up fees or any other reasonable initial costs and expenses relating to or arising under the Servicing Agreement and (ii) any reasonable fees and expenses of Servicer (including, without limitation, reasonable attorneys' fees and disbursements) in connection with ... any … work-out of the Loan …."  Therefore, TCG's Workout Fee Claim should be disallowed because there is no basis for charging a percentage "workout" fee under the Loan Agreement.

121.    Its Claim also should be disallowed because, as noted above (*see* Point II(A), *supra*), Wells Fargo Bank repeatedly engaged in bad faith, predatory tactics against Debtor and it should not be rewarded for its misconduct.

## XI.    TCG's CLAIM FOR INSURANCE ADVANCES SHOULD BE DISALLOWED

122.    In its improper "Updated Payoff Amount" calculation, TCG attempts to add a new "Insurance Advances" Claim.  It renamed and expanded the "Tax Advances" Claim in the POC to "Tax and Insurance Advances" and, without explanation, raised the amount of the Claim from $299,360.93 to $650,244.07.

123.    As set forth above in Point I(E), TCG's improper "update" violates the November 5, 2018 bar date in this Court's Order dated September 24, 2018.  It impermissibly seeks to add new categories of Claims to the POC that which were not included in the original POC filed by Wilmington, and to raise the overall amount of the pre-petition Claims.

124.    Furthermore, the portion of the "Tax and Insurance Advances" Claim that consists of "Insurance Advances" is completely unsubstantiated.  TCG failed to produce documentation

supporting its Insurance Advances Claim in response to the recent request on August 19, 2019.

*See* Ex. Y.  Therefore, its Insurance Advances Claim should be disallowed due to the lack of any

documentation to support its Claim.

## XII.   TCG'S YIELD MAINTENANCE DEFAULT PREMIUM CLAIM SHOULD BE DISALLOWED AS OVERSTATED

125.    TCG's "Yield Maintenance Default Premium" Claim as set forth in its POC is in

the amount of $3,108,096.78 ($2,542,737.63 for Note A, and $566,359.15 for Note B).  It did not

change in the Updated Payoff Amount.

126.    Although this Court ruled that a "Yield Maintenance Default Premium"

("YMDP") Claim is enforceable,[13] the amount of TCG's Claim is miscalculated and overstated

and should be disallowed.

127.    The Loan Agreement, in § 1.1, defines "Yield Maintenance Default Premium" as

"an amount equal to the greater of:  (i) three percent (3%) of the principal amount of the Loan

being repaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate

equal to the Treasury Rate at such time) of all scheduled payments of principal and interest

payable in·respect of the principal amount of the Loan being repaid provided that the Note shall

be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over

(b) the principal amount of the Loan being repaid."  *See* Ex. F, Loan Agreement, § 1.1.  The

"Free Window Date" is defined as "the Payment Date that occurs four (4) months prior to the

Stated Maturity Date," and the "Stated Maturity Date" is defined as May 6, 2025.  *See id*.

128.    TCG's YMDP Claim is improperly calculated.  It failed to take into account the

total payments of interest made by Debtor during the bankruptcy proceeding in the amount of

$1,195,975.00 through the May 15, 2019 effective date of the Plan.  Any calculation of the

---

[13]    *See* footnote 3, *supra*.

01101923.13

YMDP must take into account these payments.  The resulting correct calculation shows that the

YMDP is $1,419,866.00.  (*See* Ex. EE for Debtor's calculation of YMDP)

**XIII.  TCG'S CLAIM FOR A PAYOFF PROCESSING FEE IS UNSUBSTANTIATED
AND SHOULD BE DISALLOWED**

129.    TCG asserts a "Payoff Processing Fee" Claim in the amount of $2,650.00.  There

is no documentation supporting this Claim and none was provided in response to the request on

August 19, 2019.

**XIV.  TCG'S PROOF OF CLAIM IS MISSING CERTAIN CREDITS OWED
TO DEBTOR FOR AN UNALLOCATED BALANCE AS OF 7/31/18 AND
AMERICAN EXPRESS FUNDING TO LOCKBOX**

130.    TCG's POC erroneously omits certain amounts of revenue received or earned by

Debtor post-petition that should have been applied to reduce the loan debt:  (i) the "Unallocated

Balance as of 7/31/18," in the amount of $146,368.35, and (ii) "Amex Funding to Lockbox," in

the amount of $209,000.00.

131.    As of July 31, 2018, the Petition Date, there was an "Unallocated Balance" of

loan monies funded by Wilmington into Debtor's Cash Management Account (which was

controlled and maintained by Wells Fargo Bank), in the amount of $146,368.35.  This amount is

substantiated by Wells Fargo bank statements for the Cash Management Account for the period

August – December 2018.  *See* Ex. T, Cash Management Account statement.

132.    On the same date, there also was $209,000.00 in Debtor's "Lockbox" account

(also controlled and maintained by Wells Fargo Bank), consisting of post-petition payments

made by American Express to Debtor.  This amount is substantiated by bank statements for the

Lockbox account and AmEx Statements.  *See* Ex. BB, Lockbox statement and AmEx

Statements.

133.    Both amounts should be applied to reduce the total amount of TCG's Claims.

Dated: New York, New York
September 11, 2019

SILVERMAN ACAMPORA LLP

By:    /s/Kenneth P. Silverman
          Kenneth P. Silverman, Esq.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
BPowers@SilvermanAcampora.com

- and -

Alan D. Zuckerbrod, Esq.
WILK AUSLANDER LLP
1515 Broadway, 43rd Floor
New York, New York 10036
(212) 981-2200
azuckerbrod@wilkauslander.com

*Co-Counsel for Debtor, 1141 Realty Owner LLC*

01101923.13