```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                                 :
                                                       :
1141 REALTY OWNER LLC,                                 :
                                                       :        Chapter 11
                                                       :        Case No. 18-12341 (SMB)
                        Debtor.                        :
-------------------------------------------------------X
```

## MEMORANDUM DECISION AND ORDER REGARDING TCG DEBT ACQUISITION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**A P P E A R A N C E S:**

WOODS OVIATT GILMAN LLP
1900 Main Place Tower
Buffalo, New York 14202

    John K. McAndrew, Esq.
    William F. Savino, Esq.
        Of Counsel

BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue
New York, New York 10022

    Mark A. Frankel, Esq.
        Of Counsel

*Attorneys for TCG Debt Acquisitions 2 LLC*

SILVERMAN ACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753

    Kenneth P. Silverman, Esq.
        Of Counsel

WILK AUSLANDER LLP
1515 Broadway, 43rd Floor
New York, New York 10036

    Alan D. Zuckerbrod, Esq.
        Of Counsel

*Attorneys for Debtor, 1141 Realty Owner LLC*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The Debtor, 1141 Realty Owner, LLC, borrowed $25 million from the predecessor of TCG Debt Acquisitions 2 LLC ("TCG"). TCG filed claims, described below, that included, among other things, default interest on the loan and associated attorneys' fees and expenses. TCG now moves for partial summary judgment seeking a determination that it is entitled to default interest as of no later than January 1, 2016 for several reasons and is entitled to its attorneys' fees and expenses in enforcing its rights. (*Memorandum of Law in Support of Motion for Partial Summary Judgment*, dated Dec. 13, 2019 ("*Motion*") (ECF Doc. # 209).) For the reasons that follow, the motion is granted as to the request for default interest but the amount of TCG's attorneys' fees and expenses present disputed factual issues that must be determined in the course of future proceedings.

## BACKGROUND

Although the Debtor disagrees, the material facts relating to the default are undisputed.[1] At all relevant times, the Debtor owned and operated the Flatiron Hotel (the "Hotel") located at 9 West 26th Street, New York, NY 10010 (the "Property"). Jagdish Vaswani ("Vaswani") owned 90% of the Debtor and You Gotta Have Faith LLC

---

[1] TCG submitted a lengthy, argumentative declaration by Michael K. Shah, a manager of TCG, that purported to narrate the facts supporting the *Motion*. (*See Declaration of Michael K. Shah in Support of Motion for Partial Summary Judgment*, dated Dec. 19, 2019 ("*Shah Declaration*") (ECF Doc. # 207).) With one exception relating to TCG's acquisition of its interest, the pertinent events occurred before TCG acquired its interest and Shah plainly lacks personal knowledge of the facts. Accordingly, and but for the one exception, I have not considered its content on the matters discussed in this opinion. I have only considered the exhibits attached to his declaration. This is not intended as a criticism of Shah but of TCG's counsel.

2

("YGHF") owned the remaining 10%. Robert K.Y. "Toshi" Chan ("Chan") owned 100% of YGHF.

On April 16, 2015, the Debtor borrowed $25 million from TGC's predecessor (Rialto) evidenced by Note A in the amount of $22,500,000 and Note B in the amount of $2,500,000, both secured by the Property. The documents ("Loan Documents") comprising this transaction included a Loan Agreement,[2] (*Shah Declaration*, Ex. 1), and Mortgage Agreement.[3] (*Shah Declaration*, Ex. 3.) Rialto subsequently assigned its interests to Wilmington Trust, N.A. ("Wilmington") and RMEZZ Flatiron LLC and RMEZZ Flatiron LLC and Wilmington transferred their interests to TCG on May 18, 2018 and April 18, 2019, respectively. (*Shah Declaration* at ¶ 16.)

The Debtor had the use of three liquor licenses (the "Liquor Licenses") issued by the New York State Liquor Authority ("SLA") to Chan's wholly-owned affiliates, 9 West 26 St. Rest., LLC or Toshi's Penthouse, Inc. (the "Licensees").[4] The Liquor Licenses listed Chan, among others, as the principal of the corporate licensee. (*See Zuckerbrod Declaration,* Ex. H.) Under a Management Agreement executed as part of the same

---

[2] A copy of the *Loan Agreement*, dated April 16, 2015, is annexed as Exhibit 1 to the *Shah Declaration*.

[3] A copy of the *Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Fixture Filing and Security Agreement*, dated April 16, 2015, is annexed as Exhibit 3 to the *Shah Declaration*.

[4] Section 1.1.2 of the Loan Agreement defines "Liquor License":

"Liquor License" shall mean, collectively, (i) Hotel Liquor License certificate License Serial No. 1257575 issued to 9 WEST 26 ST. REST., LLC, a New York limited liability company, on January 24, 2014, and expiring on January 31, 2016, (ii) License Serial No. 1266611 issued to 9 WEST 26 ST. REST., LLC, a New York limited liability company, on February 1, 2014, and expiring on January 31, 2016, and (iii) License Serial No. 1266607 issued to TOSHI'S PENTHOUSE INC., a New York corporation, on January 1, 2015, and expiring on December 31, 2016, as each may be replaced, modified or extended.

transaction,[5] the Debtor hired another Chan affiliate, You Gotta Have Faith Realty, LLC ("Manager"), to manage the Property. The Management Agreement gave the Manager the "exclusive supervision and control" of the operations "in consultation with and oversight of the [Debtor]." (*Id.* at § 1.02.) Among other things, the Manager bore the responsibility to provide food and beverage services. (*Id.* at § 1.03(10).) The Management Agreement terminated on December 31, 2015, (*id.* at § 2.01), unless terminated sooner upon written notice by one of the parties. (*Id.* at § 2.02.)

According to Chan, who is the principal of the Manager, he stopped providing services under the Management Agreement in August 2015. In a declaration, dated Sept. 29, 2017, submitted to the United States District Court for the Southern District of New York in connection with his motion to intervene in a foreclosure action discussed below, (*see Shah Declaration*, Ex. 13), Chan stated that Vaswani had terminated the Management Agreement in August 2015, removed Chan at that time and Chan had not functioned in any managerial capacity since then. (*Id.*, Ex. 13, at ¶¶ 4, 6.) The Debtor then took steps to cause the Liquor Licenses to be transferred to the Debtor but no transfer had occurred as of the date of Chan's declaration. (*Id.* at ¶¶ 7, 8.) There is no dispute that Chan's managerial role ended, if not in August, then no later than December 31, 2015 when the Management Agreement terminated by its own terms and was not extended or renewed.

Despite the termination of Chan's managerial authority and the failure to transfer the Liquor Licenses, the Debtor continued to sell liquor using Chan's Liquor Licenses.

---

[5] A copy of the *Management Agreement*, dated April 16, 2015, is annexed as Exhibit 4 to the *Shah Declaration*.

4

In a September 11, 2017 email to Wilmington's special servicer, Kevin Semon, Vaswani stated that

> 1141 Broadway Restaurant and Penthouse Operations LLC is the entity operating the F&B 90% Owned by Jagdish Vaswani and 10% owned by Robert Chan.  We are still operating under the hotel license issued to Robert Chan under 9W 26th Street LLC.  Discussions to add my name to the license are still ongoing.

(*Shah Declaration*, Ex. 16.)  Moreover, Vaswani admitted in his *Declaration of Jagdish Vaswani*, dated Sept. 25, 2017 (attached to the *Zuckerbrod Declaration* as Ex. C), submitted in the foreclosure action in opposition to the motion by Wilmington Trust, N.A., TCG's immediate predecessor, two years after Chan's termination, that liquor sales accounted for one-third of the food and beverage revenues, and "even if the Hotel stopped serving alcohol," it would not affect the lender's collateral which was otherwise fully protected.  (*Id.*, Ex. C, at ¶ 9 n. 2.)

Chan's termination underlies the underlies the Debtor's default.  An Event of Default occurs under section 7.1(xii) of the Loan Agreement "if, without Lender's prior written consent, any required license, permit, including, without limitation the Liquor License, relating to the Property ceases to be in full force and effect." (Loan Agreement § 7.1(xii).)  This Event is non-curable.  Wilmington took the position that as a result of the termination of Chan as Manager, the "Liquor License . . . relating to the Property cease[d] to be in full force and effect" because the Debtor could no longer use the Liquor Licenses to sell liquor.  As a result, Wilmington's counsel sent a Notice of Default/Notice of Termination, dated Sept. 15, 2017, (*Shah Declaration*, Ex. 27), stating that the Debtor was in default under the Loan Documents "in that, among other things, Borrower has

5

failed to maintain valid and effective liquor licenses issued by the New York Liquor Authority permitting Borrower to serve alcoholic beverages at the Property."

Three days later, Wilmington commenced an action in the United States District Court, Southern District of New York, No. 17-cv-7081 (the "*Foreclosure Action*"), seeking to foreclose on the Property on the grounds that "Borrower's failure to maintain valid and effective liquor licenses issued by the SLA permitting Borrower to serve alcoholic beverages at the Property constitutes an Event of Default under the Loan Documents." (*Verified Complaint* at ¶ 31, *Wilmington Trust, N.A. v. 1141 Realty Owner LLC*, No. 1:17-cv-07081-LGS-SLC (S.D.N.Y. Sept. 18, 2017), ECF Doc. # 1.)

**The Bankruptcy**

On July 31, 2018, the Debtor filed this chapter 11 case, staying the foreclosure action. On November 2, 2018, Wilmington filed Claim No. 14 in the amount of $32,048,285.29.[6] The claim included, *inter alia*, default interest on the two notes in the aggregate sum of $3,155,801.16. (*Objection Declaration*, Ex. A at ECF p. 9 of 19.)[7] TCG subsequently transmitted an "Updated Payoff Amount" calculation to Debtor on April 25, 2019, seeking default interest in the sum of $4,136,924.62. (*Id.*, Ex. C, at ECF p. 2 of 19 (ECF Doc. # 186-5.) Finally, on June 14, 2019, TCG filed Claim No. 17 asserting an administrative claim for post-petition interest ($2,144,942.92) and legal fees ($419,860.64). (*Id.*, Ex. B, at ECF p. 7 of 31.) In the meantime, on May 9, 2019, the

---

[6]     A copy of Claim No. 14 is annexed as Exhibit A to the *Declaration of Alan D. Zuckerbrod, in Support of Objection of Reorganized Debtor, 1141 Realty Owner LLC, to Pre-Petition Claims and Administrative Claims of TCG Acquisitions 2 LLC*, dated Sept. 11, 2019 ("*Objection Declaration*") (ECF Doc. # 186).)

[7]     "ECF p." refers to the pagination imprinted at the top of every page of a document filed on the Court's CM/ECF system.

6

Court confirmed the Debtor's plan. ("*Plan*").[8]  (ECF Doc. # 159.)  The *Plan* provided for the payment of the TCG's lien claims in full.  (*See Plan* § 3.06.)

The Debtor objected to Claim Nos. 14 and 17 as well as the Updated Payoff Letter on numerous grounds on September 11, 2019.  (*Objection of Reorganized Debtor, 1141 Realty Owner LLC, to Pre-Petition Claims and Administrative Claims of TCG Acquisitions 2 LLC*, dated Sept. 11, 2019 ("*Claim Objection*") (ECF Doc. # 186).)  During a hearing held on November 13, 2019, the Court instructed the parties to file the instant motion for summary judgment to narrow the issues.

TCG filed the *Motion* on December 13, 2019.  It contends, *inter alia,* that default interest started to accrue as early as December 31, 2015 or January 1, 2016, when the Management Agreement terminated by its own terms and Chan ceased managing the Debtor's food and beverage services.  (*Motion* at 5, 13-15, 19-21.)  At that point, the Liquor Licenses were no longer "in full force and effect" "relating to the Property" within the meaning of the Loan Agreement.[9]  (*Motion* at 20-21.)  Any subsequent sale of alcohol by the Debtor, an affiliate of the Debtor or Vaswani constituted illegal "availing" in contravention of New York Alcoholic Beverage Control Law ("ABC") § 111.  (*Motion* at 13-15.)  The Debtor responds that the Liquor Licenses never "cease[d] to be in full force and effect" because the SLA never revoked, cancelled, or suspended them.  (*Opposition* at 7-9.)

---

[8]     *First Amended Plan of Reorganization for 1141 Realty Owner LLC and Flatironhotel Operations LLC Under Chapter 11 of the Bankruptcy Code*, dated February 20, 2019 (ECF Doc. # 159-1).

[9]     TCG asserted additional objections that it included in the *Motion* but it is unnecessary to reach those arguments in light of the disposition of the *Motion*.

7

# DISCUSSION

## A. Standard Governing the Motion

The *Loan Agreement* is governed by New York law. (Loan Agreement § 9.3.) When asked to interpret contractual language, the question under New York law is "whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). Ambiguity presents a question of law. *Id.* A contract is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks and citation omitted); *accord Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010); *Maverick Tube*, 595 F.3d at 466. An agreement is not ambiguous if it has a definite and precise meaning, and unambiguous language does not become ambiguous because a party urges a different interpretation that strains the language beyond its ordinary meaning. *Maverick Tube*, 595 F.3d at 467; *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Where the dispute concerns a provision of the contract, the Court must consider the contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases," *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007); *accord Maverick Tube*, 595 F.3d at 468, and "seek to give '[e]ffect and meaning . . . to every term of [a] contract.'" *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 284 (S.D.N.Y. 2012) (quoting *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996)).

If the contract is ambiguous, "'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir. 1998)). If no extrinsic evidence exists, the court may determine the meaning of the contract as a question of law. *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir. 2000); *Hartford Acc. & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973) ("[I]f the equivocality must be resolved wholly without reference to extrinsic evidence the issue is to be determined as a question of law for the court.").

### B.    "Availing"

ABC § 111 is central to the parties' dispute. It provides in pertinent part:

> A license issued to any person . . . for any licensed premises shall not be transferable to any other person or to any other premises or to any other part of the building containing the licensed premises except in the discretion of the authority. It shall be available only to the person therein specified, and only for the premises licensed and no other except if authorized by the authority. . . .

A violation of ABC § 111 constitutes "availing." *See Hacker v. State Liq. Auth. of State of N.Y.*, 225 N.E.2d 512, 516 (N.Y. 1967) ("the allowing of someone not mentioned in the application or license to avail himself of the license . . . is an actual substantive violation of the Alcoholic Beverage Control Law which did not occur solely at the time of the licensee's application, but rather continued throughout the entire duration of the license (§ 111)"). "The principal purpose of section 111 has been said to be the prevention of undesirable persons, ineligible to secure a license, from operating a liquor business through another licensee as a blind." *Cleveland Place Neighborhood Ass'n v. New York*

*State Liquor Auth.*, 709 N.Y.S.2d 12, 15-16 (N.Y. App. Div. 2000) (quotations omitted) (citing *Potter v. New York State Liq. Auth.*, 322 N.Y.S.2d 829, 831 (N.Y. App. Div. 1971)). The key to availing is not ownership of the licensed premises, but rather "direction, supervision or oversight" of liquor sales. *See Alla Capital Dev. Corp. v. New York State Liq. Auth.*, 74 N.Y.S.3d 810, 812 (N.Y. App. Div. 2018) ("licensee may not make its liquor license available to another by leaving the licensed premises under the control of an individual or entity without 'direction, supervision or oversight,' even where that person receives no financial benefit").

Under ABC § 111, a liquor license is limited to the particular licensee and the specific premises. Thus, the licensee cannot use it at another location and a non-licensee cannot use it at the premises named in the license. Furthermore, the ABC focuses on the individuals behind the corporate licensee. *See* ABC § 126(4) (precluding the issuance of a license to a corporation unless the principal officers and directors satisfy the individual requirements and are not subject to the disqualifying limitations set forth therein). A corporate licensee operated by an undisclosed principal without the SLA's permission violates the ABC. *Shore Haven Lounge, Inc. v. New York State Liquor Auth*, 332 N.E.2d 883, 884 (N.Y. 1975) (citing ABC § 99-d(2));[10] *see Dumbarton Oaks Restaurant & Bar, Inc. v. New York State Liquor Auth*, 446 N.E.2d 128, 129 (N.Y. 1983) (a licensee cannot permit someone not named in the license to avail himself of the

---

[10]    ABC § 99-d(2) provides, in pertinent part:

> Before any change in the members of a limited liability company or the transfer or assignment of a membership interest in a limited liability company or any corporate change in stockholders, stockholdings, alcoholic beverage officers, officers or directors, . . . can be effectuated for the purposes of this chapter, there shall be filed with the liquor authority an application for permission to make such change . . . .

license); *Happy Landing Lounge, Inc. v. State Liquor Auth.*, 631 N.Y.S.2d 466, 466-67 (N.Y. App. Div. 1995) (sole principal of corporate licensee who "provided no direction, supervision or oversight of the business during his sojourns, leaving the affairs and finances of the bar in the unfettered discretion of" his friends was held to permit his friends "to avail themselves of its liquor license in contradiction of Alcohol Beverage Control Law § 111"); *De Leon v. New York State Liquor Auth.*, 582 N.Y.S.2d 4, 5 (N.Y. App. Div. 1992) (petitioner-licensee who sold the licensed premises to vendee who operated the premises without licensee's involvement was guilty of availing); *see generally* 3 N.Y. JUR. 2d, *Alcoholic Beverages* § 25 ("Allowing someone not mentioned in either the application for a liquor license or the license itself to avail himself of the license constitutes . . . an actual substantive violation of the [ABC § 111].") Accordingly, the principal named in the application or the license must manage the operations.

The Debtor does not dispute that the Property is the licensed premises of the Liquor Licenses or that Chan, the principal named in the Licensees, is the person authorized to use the Liquor Licenses issued to his corporations at the Property. In addition, there is no contention that the Debtor used the Liquor Licenses to sell liquor at other premises. Hence, the sole question is whether the Liquor Licenses ceased to be in "full force and effect" within the meaning of the Loan Agreement once the Debtor terminated Chan as Manager even if the Liquor License were not revoked by the SLA.

I conclude that TGC's interpretation of the Loan Agreement is reasonable, the Debtor's is not, and accordingly, an Event of Default occurred when Chan ceased to manage the operations of the Debtor, and specifically, the food and beverage service. At that point, the new managers of the Debtor, whoever they were, could not sell liquor at

the Property. They did not have a liquor license of their own and they could not use Chan's license. Thus, although the Liquor Licenses had not been revoked by the SLA and Chan could arguably have returned to manage the food and beverage service thereby allowing the Debtor to sell liquor at the Property, the Liquor Licenses were not effective to sell liquor at the Property without Chan.

The Debtor's interpretation, which equates the absence of "full force and effect" with revocation, is unreasonable. Obviously, the Liquor Licenses would not be in full force and effect at any location if they were revoked. But that was not the only circumstance that rendered them ineffective at the Property. As noted, the Debtor could not hire another manager and use Chan's Liquor Licenses. The Debtor's basic argument, that the parties contemplated a distinction between Liquor Licenses that had been revoked and unrevoked Liquor Licenses that could not be used to sell liquor at the premises, is untenable.

Indeed, the Agreement Regarding Liquor Licenses, dated Apr. 16, 2015 ("Liquor Licenses Agreement"), (*see Shah Declaration*, Ex. 6), among the Debtor, the Licensees, and Rialto, demonstrates the parties' focus on the importance of effective liquor licenses. As noted, liquor sales generated revenue needed to repay the loan. Through the Liquor Licenses Agreement, executed as "additional consideration for the making of the Loan by [Rialto]," the Debtor and the Licensees agreed that in the event Rialto acquired the Hotel through foreclosure, they would provide cooperation and assistance to Rialto to continue to use the existing Liquor Licenses and any other liquor licenses subsequently acquired under which alcoholic beverages were served at the Hotel and to obtain new licenses as required by law. (*Id.* at ¶ F, § 2, at 2.) If Rialto could have used

12

the unrevoked Liquor Licenses, Rialto would not have required the Debtors' and the Licensees' cooperation to continue using the Liquor Licenses.

Nor was this Event of Default covered by a different default provision, requiring notice and an opportunity to cure, to the exclusion of section 7.1(xii). The Debtor covenanted under the Loan Agreement to comply generally with all Legal Requirements as defined therein and specifically to "keep in full force and effect all material licenses, permits and applicable governmental authorizations necessary for the continued use and operation of the Property." (Loan Agreement § 4.1.1.)  The Debtor contends that the illegal sale of liquor and availing violated section 4.1.1, the Loan Agreement must be strictly construed, and accordingly, no Event of Default occurred absent notice and an opportunity to cure.  (*See Opposition* at 9, 11.)

This argument lacks merit.  Section 4.1.1 lists the Debtor's loan covenants, not the Events of Default.  Section 7.1 lists the Events of Default and addresses the specific situation where the Liquor Licenses, a defined term in the Loan Agreement, (*see* Loan Agreement at § 1.1, at pp. 6-7), cease to be of "full force and effect." (Loan Agreement § 7.1(xii)).  Furthermore, section 7.1 identifies other Events of Default that do require notice and an opportunity to cure.  (*E.g.,* Loan Agreement at §§ 7.1(viii), (ix).)  "It is axiomatic that courts construing contracts must give specific terms and exact terms . . . greater weight than general language." *County of Suffolk v. Long Island Lighting Co.*, 266 F.3d 131, 139 (2d Cir. 2001) (quotations omitted) (citing Restatement (Second) of Contracts § 203(c) (1981)).  Here, section 7.1 deals with Events of Default and the specific language in section 7.1(xii) lists ineffective Liquor Licenses as an Event of

13

Default not requiring notice and an opportunity to cure.[11] (*See also* Loan Agreement at § 9.11.)[12] This specific language trumps section 4.1.1's covenants which have nothing to do with Events of Default. Thus, no notice was required. That Wilmington gave notice in September 2017 prior to foreclosing and accelerating the debt does not mean that an Event of Default did not occur until then. Further, default interest began to run until the default was cured or the debt was fully paid. (Loan Agreement at § 2.2.1 ("The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full.").) The record does not reflect whether or when this particular default was cured.

Finally, the Debtor's authorities are distinguishable. It cites *Kelly v. Casale,* 695 N.Y.S.2d 184 (N.Y. App. Div.), *lv. to appeal denied*, 723 N.E.2d 89 (N.Y. 1999 (Table) for the "undisputed" proposition that a liquor license remains in "full force and effect" unless it has been revoked. (*Opposition* at 7.) There, the SLA revoked Kelly's liquor license for allowing the licensed premises to become disorderly in violation of ABC

---

[11]  The Debtor implies that it did not sell liquor after Chan ceased operating the food and beverage service, (*Opposition* at 10-11), although Vaswani's September 2017 email and declaration show otherwise. In any case, whether the Debtor did or did not sell liquor without Chan is immaterial. The Event of Default occurred when the Liquor Licenses ceased to be of full force and effect at the Property, not when the Debtor thereafter illegally sold liquor.

[12]  Loan Agreement § 9.11 provides:

> **Waiver of Notice.** Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

14

§ 106(6). *Kelly v. Casale*, 695 N.Y.S.2d at 185. Kelly brought an Article 78 proceeding to review the revocation, arguing, among other things, that the six-year delay between the cited violations and the revocation caused him prejudice. Specifically, he maintained that he had expended substantial sums to renovate the premises during the six years relying on the fact that his license had been renewed in the interim. *Id.* The court rejected the claim of prejudice because the renewal of Kelly's license had allowed him to continue in business. *Id.* Importantly, the case did not involve availing. Kelly did not let someone else use his license to sell liquor at his premises.

Here, Debtor violated a different provision, ABC § 111, which allows only those persons specified in the license to sell liquor at the specified premises. While the licensee in *Kelly v. Casale* was allowed to operate his business until the license was revoked, it does not follow that the Debtor could sell alcohol at the Hotel until Chan's Liquor Licenses were revoked. Once Chan's management ceased, the Liquor Licenses were not in "full force and effect" at the premises within the meaning of the Loan Agreement.

The Debtor also argues that the SLA must hold a hearing before it can revoke, cancel, suspend a license or subject a licensee to a monetary penalty. *See* ABC § 119(1)-(3); *see also Brenner v. Bruckman*, 3 N.Y.S.2d 265, 268 (N.Y. App. Div. 1938), *appeal dismissed*, 278 N.Y. 503 (1938); *Yates v. Mulrooney*, 281 N.Y.S. 216, 218-19 (N.Y. App. Div. 1935). However, as discussed above, the Liquor Licenses were not in "full force and effect" at the Hotel without regard to whether the SLA held a hearing or actually revoked the Liquor Licenses.

15

## C.     Attorneys' Fees

The Loan Documents generally permit TCG to recover the reasonable attorneys' fees and expenses incurred in enforcing its rights.[13]  The Debtor contends that Wilmington's pre-petition attorneys' fees incurred in its "improper" foreclosure action should be disallowed in their entirety but does not dispute TCG's reasonable post-petition attorneys' fees if the acceleration was justified.  (*Opposition* at 33.)  The Debtor also incorporates by reference its previous objection to TCG's claims concerning the unreasonableness and excessiveness of TCG's attorneys fees.  (*See Claim Objection* at ¶¶ 80-104.)

The Court has concluded that an Event of Default occurred no later than January 1, 2016 when the Liquor Licenses ceased to be of full force and effect.  That Event of Default (as well as others) formed the basis for the foreclosure action.  The foreclosure action was not "improper."  Accordingly, TCG is entitled to its reasonable pre-petition

---

[13]   Section 9.13 of the Loan Agreement requires the Debtor to reimburse Lender:

for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in the Loan Documents . . . ; (v) enforcing or preserving any rights . . . in each case against, under or affecting [Debtor], the Loan Documents, the Property or any other security given for the Loan; and (vi) enforcing any Obligations of or collecting any payments due from [Debtor] . . . under the Loan Documents . . . in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature . . . of any Bankruptcy Action . . . .

Under Section 5.6 of the Mortgage Agreement, Debtor agreed to pay Lender:

reasonable legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interests in the Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property (including commencing any foreclosure action), whether or not any legal proceeding is commenced . . . , together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

16

attorneys' fees and expenses incurred in connection with the foreclosure suit. Furthermore, because TCG is oversecured, the portion of its Claims for attorneys' fees and expenses is secured. *See* 11 U.S.C. § 506(b). However, the reasonableness of those fees as well as the post-petition fees, and hence, the allowed amount to be paid under the *Plan*, requires the Court to consider the sufficiency of TCG's (and its predecessors') contemporaneous time records and any other evidence bearing on the question of reasonableness. This determination must await further proceedings.

## CONCLUSION

The *Motion* is granted to the extent of declaring that the Debtor was in default under section 7.1(xii) of the Loan Agreement no later than January 1, 2016 and default interest ran from that date. In light of this determination, the Court does not address the other alleged defaults identified by TCG. In addition, TCG is entitled to the reasonable attorneys' fees and expenses to the extent provided by the Loan Documents, including those reasonable attorneys' fees and expenses incurred in connection with the foreclosure action, but the liquidation of that part of TCG's claims must also await another day. The Court has considered the Debtor's remaining arguments and concludes that they lack merit.

So ordered.

Dated:   New York, New York
         March 17, 2020

                                            /s/ *Stuart M. Bernstein*
                                            STUART M. BERNSTEIN
                                            United States Bankruptcy Judge